920 A.2d 1097

**Alice McNACK, et al.**

v.

**STATE of Maryland, et. al.**

**No. 98, Sept. Term, 2006.**

Court of Appeals of Maryland.

April 12, 2007.

David S. King (Kathleen Behan, Robert Jones Worrall, Arnold & Porter, LLP, Steven D. Annand, Janell M. Byrd, Cochran Firm, on brief), Washington, DC, for appellants.

David E. Ralph, Chief of Litigation (William R. Phelan, Jr., Principal Counsel, Steven Potter, Asst. Solicitor, Baltimore City Dept. of Law, Karen Stakem Hornig, Chief Legal Counsel, Baltimore Police Dept., on brief), Phillip M. Pickus, Asst.

**384**

Atty. Gen. (Douglas F. Gansler, Atty. Gen., on brief), for appellees.

Argued before RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE, JOHN C. ELDRIDGE (Retired, Specially assigned) and ALAN M. WILNER (Retired, Specially assigned), JJ.

CATHELL, J.

This case arises from the deaths of seven members of the Dawson family in a fire-bombing of their Baltimore City home. Relatives of the Dawson family, appellants, filed suit against the State of Maryland (the "State") and the Mayor and City Council of Baltimore (the "City"), collectively appellees.[1] Appellants allege that the City had actively sought cooperation from members of the public in combating the illicit drug trade occurring throughout the city, but that when the Dawson family cooperated with the Baltimore City Police Department (the "BCPD"), the State and the City failed to protect them from retaliation by those against whom the Dawsons complained. Appellants alleged below that the State and the City violated the Dawson family's right to due process and equal protection under Article 24 of Maryland's Declaration of Rights.[2] Appellants also alleged that the government entities were negligent in failing to protect the Dawson family. The

---

1. In addition to suing the State and the Mayor and City Council of Baltimore, appellants also filed suit against the Baltimore City Police Department, the Baltimore City State's Attorney's Office, the Governor of the State of Maryland, the former Mayor of Baltimore City, Martin O'Malley, the State's Attorney for Baltimore City, Patricia Jessamy, an Assistant State's Attorney, Katherine Moxley, the current Baltimore City Police Commissioner, Leonard D. Hamm, a former Baltimore City Police Commissioner, Edward Norris, Gregory Eads, and 40 unnamed police officers and their supervisors. For clarity's sake, we will generally refer to them by the governmental entity by which they were employed.

2. "That no man shall be taken or imprisoned or dissiezed of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty, or property, but by the judgment of his peers, or by the Law of the land." Md. Const. Declaration of Rights, Art. 24.

State and the City argued that, with respect to the state constitutional claims, they did not owe appellants a duty and that the prerequisite for them to be found negligent under a traditional tort action, a special relationship, did not exist in this situation. The Circuit Court for Baltimore City, agreeing with the State and the City, dismissed the case on May 25, 2002, because appellants failed to state a claim upon which relief could be granted.

Appellants noted an appeal to the Court of Special Appeals. Prior to consideration in that court and on our own initiative, we issued a writ of certiorari, *McNack v. State of Maryland*, 396 Md. 11, 912 A.2d 647 (2006), to consider the following issues:

"1. At the motion to dismiss stage and taking all factual allegations as true, do Appellants allege facts to state a claim for violations of constitutionally protected due process rights under the 'state created danger' doctrine?

"2. At the motion to dismiss stage and taking all factual allegations as true, do appellants allege a special relationship between members of the Dawson family and Defendants?

"3. Did the trial court err as a matter of law by dismissing Appellants' claims prior to discovery, where the Appellants' primary eyewitnesses are deceased leaving the Defendants solely and uniquely in possession of relevant information otherwise unavailable to Appellants at the pleading stage?"

We hold that the Circuit Court for Baltimore City was correct as a matter of law when it found that the state-created danger theory did not apply under the assumed circumstances of this case; and, we also hold that on the facts pled, a special relationship did not exist between the appellees and the Dawson family. We further hold that the trial court did not err in dismissing the case prior to discovery being conducted.

## I. Facts

In 1999, Angela and Carnell Dawson, along with five of their children, moved into 1401 East Preston Street in the East

Oliver neighborhood of Baltimore City. In the Spring of 2002, Baltimore City launched its "Believe Campaign to Combat Drug Trafficking." Appellants maintained that the City's "Believe Campaign" pro-actively "solicited and encouraged Baltimore residents, including the Dawsons, to participate in the program by reporting illegal drug activities in their neighborhoods." Appellants also asserted that the campaign was instituted even though the City "plainly knew or had reason to know that they were not able to provide adequate protection for responding witnesses." Appellants assert that the City, despite knowing that it did not have the ability to protect witnesses, launched the Believe Campaign in "the midst of a violent retaliatory drug culture in certain areas of Baltimore City, where lack of witness cooperation was commonplace due to well-founded fear of retaliation."

Between January 1, 2000, and October 16, 2002, a total of 109 calls were made by the Dawson family to 911 or 311. The calls were generally made to report drug activity or disorderly persons in the vicinity of the Dawson family home. According to the appellants, the BCPD did not respond to these calls quickly and sometimes failed to respond at all. When the BCPD did respond, the officers would go directly to the Dawson family home, "indicating to the entire neighborhood, including the drug dealers, that it was the Dawsons who had called the police."

According to appellants, the drug dealers, made aware that the Dawsons were reporting them to the BCPD by officers arriving at the family home, began to threaten and attack members of the family in order to prevent future calls to the BCPD. Appellants allege that on August 23, 2002, a drug dealer named John Henry wrote the word "Bitch" on an exterior wall of the family home and assaulted Angela Dawson by slapping her across the face. The same man allegedly threw bricks though windows in the family home on August 25, 2002, and September 4, 2002. He also allegedly hit Angela Dawson in the chest with a bottle on September 25, 2002. The next day, the Dawsons reported to the BCPD that a

different man, Darrell Brooks, was one of several people throwing bottles at their house.

Appellants, relying on a transcript of one of Carnell Dawson's phone calls to 911, allege that on October 1, 2002, John Henry and several other men surrounded the Dawson family home and threatened to "bust up [the home's] windows and shoot up my house." On October 2, 2002, the BCPD apparently arrested John Henry, but he was released that same day. Appellants allege that the next day, October 3, 2002, at approximately 3:15 am, a Molotov Cocktail was thrown through the kitchen window of their home. Angela Dawson was able to extinguish the fire and the family was able to exit the house without serious bodily harm.

Appellants assert that the BCPD, in response to the Molotov Cocktail incident, promised to give the Dawsons increased protection by placing them on a "Special Attention List"[3] and that the police "advised the Dawsons to move out of their home."[4] Appellants also allege that an individual within the Baltimore City State's Attorney's office verbally offered protection to the Dawsons, but never followed up with the necessary referrals or paperwork. According to the appellants, the Dawsons were neither placed on the Special Attention List nor into the State's Attorney's witness protection program.

Early in the morning on October 16, 2002, appellants allege that Darrell Brooks, a local drug dealer, "kicked down the Dawsons' front door, poured gasoline on their living-room floor, and set it ablaze." Carnell and Angela Dawson, along with their five children—all under the age of fourteen—died as a result of injuries suffered in the fire.

---

**3.** According to appellants, after the BCPD puts a location on the "Special Attention List," patrols are increased in that area.

**4.** Apparently, the Dawsons attempted to move after the incident. On October 4, 2002, Carnell Dawson allegedly asked appellant, Alice McNack, for money so that he could place a down payment on a new home.

## II. Standard of Review

When reviewing a "motion to dismiss a complaint for failure to state a claim upon which relief can be granted, a court must 'assume the truth of all well-pleaded facts and allegations in the complaint, as well as all inferences (favorable to the pleader) that can be reasonably drawn from them.' " *Lloyd v. General Motors Corp.*, 397 Md. 108, 916 A.2d 257 (2007) (quoting *Morris v. Osmose Wood Preserving*, 340 Md. 519, 531, 667 A.2d 624, 630 (1995)). A court will only order dismissal if, after assuming the allegations and permissible inferences stemming therefrom are assumed to be true, the plaintiff would not be afforded relief. *Lloyd*, 397 Md. at 121, 916 A.2d at 264 (citing *A.J. Decoster Co. v. Westinghouse Electric Corp.*, 333 Md. 245, 249, 634 A.2d 1330, 1332 (1994)).

When determining whether an appellant has alleged claims upon which relief can be granted, " '[t]here is . . . a big difference between that which is necessary to prove the [commission of a tort] and that which is necessary merely to allege [its commission][.]' " *Lloyd*, 397 Md. at 121, 916 A.2d at 265 (quoting *Sharrow v. State Farm Mutual Ins. Co.*, 306 Md. 754, 770, 511 A.2d 492, 500 (1986)). In such situations, "the court's decision does not pass on the merits of the claims; it merely determines the plaintiff's right to bring the action." *Lloyd*, 397 Md. at 122, 916 A.2d at 265 (citing *Figueiredo–Torres v. Nickel*, 321 Md. 642, 647, 584 A.2d 69, 72 (1991)). "Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." *Ricketts v. Ricketts*, 393 Md. 479, 492, 903 A.2d 857, 864 (2006) (citing *Allied Invest. Corp. v. Jasen*, 354 Md. 547, 555, 731 A.2d 957, 961 (1999); *Bobo v. State*, 346 Md. 706, 709, 697 A.2d 1371, 1373 (1997); *Morris*, 340 at 531, 667 A.2d at 630).

## III. Discussion

### A. State Created Danger Theory

Appellants claim that due to the City's solicitation of the Dawson family's participation in the Believe Campaign that

the City expressly or impliedly promised to protect them against the type of attack they suffered. They further allege that instead of protecting the Dawsons, the City, through the actions of the BCPD, made the danger presented by the drug dealers greater by identifying the family to the neighborhood as informants of a sort. Thus, appellants allege that the City demonstrated a willful disregard for the safety of the Dawsons and maliciously caused them to be subjected to unconstitutional treatment, resulting in their deaths.

The state created danger theory has its origins in language used in *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). In that case, Joshua DeShaney and his mother filed suit against the Winnebago County Department of Social Services (the "DSS") alleging *federal due process violations* because the DSS failed to permanently remove him from his father's custody after allegations of abuse were made. *Id.* at 191–92, 109 S.Ct. at 1001. In January of 1982, at the time of her divorce from DeShaney's father, the child's step-mother complained to police that the three year-old boy was abused by his father. DSS interviewed the father, but did not pursue the investigation. One year later, in January of 1983, Joshua was admitted to the hospital with bruises and abrasions. The treating physician notified DSS that he suspected child abuse. DSS obtained an order from a Wisconsin juvenile court which placed Joshua in the temporary care of the hospital until a "Child Protection Team" could make a determination of how best to proceed in Joshua's situation. The protection team determined that there was insufficient evidence to remove Joshua from his father's home and that he should be returned to his father's home with the understanding that his father would comply with certain conditions designed to protect Joshua. Based on the recommendation of the protection team, the juvenile court returned Joshua to the custody of his father. Over the next seven months Joshua was treated in the hospital twice more for abuse and the social worker handling his case recorded signs of abuse during her visits to the father's home in each of those months.

In March of 1984, Joshua's father beat him so severely that he went into a coma and required emergency brain surgery. Although five year-old Joshua's life was saved, he was expected to be institutionalized for the rest of his life. Joshua's father was tried and convicted of child abuse. Subsequently, Joshua and his mother brought an action in a federal court under 42 U.S.C. § 1983 (1996),[5] against Winnebago County, the DSS, and individual employees of the DSS alleging a violation of Joshua's Fourteenth Amendment Due Process rights. The trial court granted summary judgment for the defendants and the United States Court of Appeals for the Seventh Circuit affirmed.

The late Chief Justice Rehnquist, writing for the Supreme Court, explained why the State actors in Joshua's case could not be held liable under the Due Process Clause for failing to act on Joshua's behalf:

"The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.... [T]he Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing [its] power, or employing it as an instrument of oppression[.]'

---

5. " § 1983. Civil action for deprivation of rights

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."

... Its purpose was to protect the people from the State, not to ensure that the State protected them from each other. The Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes.

"Consistent with these principles, our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.... If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them. As a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."

*DeShaney,* 489 U.S. at 195–97, 109 S.Ct. at 1003–04 (citations omitted) (footnote omitted).

The Court went on to note, however, that it had recognized limited circumstances where the Due Process Clause required the State to act affirmatively with respect to prisoners and involuntarily committed mental patients. *DeShaney,* 489 U.S. at 198, 109 S.Ct. at 1004–05 (citing *Estelle v. Gamble,* 429 U.S. 97, 103–04, 97 S.Ct. 285, 290–91, 50 L.Ed.2d 251 (1976) (establishing the federal government's obligation to provide medical care for its prisoners); *Youngberg v. Romeo,* 457 U.S. 307, 314–25, 102 S.Ct. 2452, 2457–63, 73 L.Ed.2d 28 (1982) (involuntary commitment does not deprive individuals of all substantive due process rights under the Fourteenth Amendment)). The Court noted the duty to act affirmatively was only imposed in those situations because the State had taken individuals into custody against their will. *Id.* at 199–200, 109 S.Ct. at 1005.

In Joshua's case, he was not in the State of Wisconsin's custody. He had been returned to his father. While in the

process of explaining why the State did not owe Joshua a duty, the Court apparently left open the door for what has become known as the state-created danger theory when it said:

"While the State may have been aware of the dangers that Joshua faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*"

*DeShaney,* 489 U.S. at 201, 109 S.Ct. at 1006 (emphasis added).

■ The state-created danger theory, where applicable, imposes liability on a governmental entity for private acts that if committed by the government would violate constitutionally protected rights, even when no special relationship exists between the governmental entity and the injured person. *Kneipp v. Tedder,* 95 F.3d 1199, 1205 (3rd Cir.1996). Generally, this sort of claim is limited to situations in which the state increases the risk of harm to its citizens through its own **affirmative acts.** *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1066 (6th Cir.1998); *Kennedy v. City of Ridgefield,* 439 F.3d 1055, 1062 (9th Cir.2006) (stating that there may be a due process violation when the governmental action affirmatively places the plaintiff in a dangerous situation.); *Butera v. District of Columbia,* 235 F.3d 637, 650 (D.C.Cir.2001) ("Regardless of the conduct at issue, however, the circuits have held that a key requirement for constitutional liability is affirmative conduct by the State to increase or create the danger that results in harm to the individual."); *Carlton v. Cleburne County,* 93 F.3d 505, 508 (8th Cir.1996) (finding that the Due Process Clause imposes a duty when the government affirmatively places an individual in danger when the person would not have faced that situation without the state action.). "Absent such affirmative conduct by the State to endanger an individual, courts have rejected liability under a state endangerment concept." *Butera,* 235 F.3d at 650.

■ There are several problems with appellants' assertion of the state-created danger theory here. Initially, and foremost, Maryland has not adopted it as a basis upon which to

recover for violations of Maryland's Constitution.[6] Although we have acknowledged that many provisions of the Maryland Constitution are *in pari materia* with their federal counterparts, "we have also emphasized that, simply because a Maryland constitutional provision is *in pari materia* with a federal one or its federal counterpart, does *not* mean that the provision will *always* be interpreted or applied in the same manner as its federal counterpart." *Dua v. Comcast Cable of Maryland, Inc.*, 370 Md. 604, 621, 805 A.2d 1061, 1071 (2002). To date, the General Assembly has not enacted, nor has this Court adopted, the state-created danger theory as a basis for recovery under Article 24 of the Declaration of Rights. We need not decide the issue today.

Furthermore, the state-created danger theory, even when recognized by the various Federal Courts of Appeals, has only been discussed in the context of claims brought under 42 U.S.C. § 1983 for alleged violations of an individual's civil rights—rights which are protected by the United States Constitution and federal statutes. The Supreme Court did not make the state-created danger theory applicable to alleged violations of Maryland's, or any state's, constitution. The *DeShaney* Court stated:

> "A State may, through its courts and legislatures, impose such affirmative duties of care and protection upon its agents as it wishes. But not 'all common-law duties owed by government actors were ... constitutionalized by the Fourteenth Amendment.' "

489 U.S. at 202, 109 S.Ct. at 1007 (quoting *Daniels v. Williams*, 474 U.S. 327, 335, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)). We read the *DeShaney* Court's language to indicate that even though some common law torts have federal constitutional implications, it is up to the state legislatures and courts to establish the parameters for liability, if any, of each state's governmental actors with respect to civil remedies for

---

**6.** Appellants concede that "no Maryland appellate court has considered the state-created danger doctrine." Our own research does not reveal otherwise.

alleged violations of an individual's state constitutional rights. Some violations of state constitutional provisions may also allow for relief under the federal constitution, but that does not necessarily mean that the legal theory under which the remedy is obtained is always the same.[7]

Finally, the state-created danger theory, if we were to adopt it, requires an affirmative act by the governmental actor. We address whether there were any affirmative acts by governmental actors, in the present case, in our discussion of special relationships in this opinion *infra.* There, we conclude, in our discussion of special relationships, that there were no affirmative acts by governmental actors in this case. Thus, even if we were to adopt the state-created danger theory, it would not apply in this instance because the state actors did not act sufficiently affirmatively towards the Dawson family.

### B. *Special Relationship*

In order to sustain a claim for an action in negligence, a plaintiff must allege facts demonstrating " '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.' " *Remsburg v. Montgomery,* 376 Md. 568, 582, 831 A.2d 18, 26 (2003) (quoting *Muthukumarana v. Montgomery Coun-*

---

7. Appellants did not cite to any cases from other state courts addressing the state-created danger theory. Our research found a few cases, none of which is helpful to them. Of the six opinions from our sister states, all are distinguishable in one crucial respect—all were based on federal constitutional claims brought under 42 U.S.C. § 1983. *Brum v. Town of Dartmouth,* 428 Mass. 684, 704 N.E.2d 1147 (1999); *Pack v. Associated Marine Institutes, Inc.,* 362 S.C. 239, 608 S.E.2d 134 (2004); *Gonzales v. City of Camden,* 357 N.J.Super. 339, 815 A.2d 489 (2003); *Robbins v. Cumberland County Children and Youth Services,* 802 A.2d 1239 (Pa.Cmwlth.2002); *Eastland County Cooperative Dispatch v. Poyner,* 64 S.W.3d 182 (Tex.App.2001); *Wood County v. Rivers,* 51 S.W.3d 626 (Tex.App.2000). In those six cases, not one of those courts adopted the state-created danger theory as a basis for redress for violation of the respective state's constitution.

*ty,* 370 Md. 447, 486, 805 A.2d 372, 395 (2002)). This Court has held for over a century that:

> " '[T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury. . . . As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.' "

*Bobo,* 346 Md. at 714, 697 A.2d at 1375 (quoting *West Virginia Cent. & P.R. v. State ex rel. Fuller,* 96 Md. 652, 666, 54 A. 669, 671–72 (1903)). Thus, when reviewing a case which has its basis in negligence, our analysis "usually begins with the question of whether a legally cognizable duty exist[s][,]" *Remsburg,* 376 Md. at 582, 831 A.2d at 26, because *"[t]he issue of duty is one for the court as a matter of law." Dehn v. Edgecombe,* 384 Md. 606, 619–20, 865 A.2d 603, 611 (2005) (citing *Hemmings v. Pelham Wood,* 375 Md. 522, 536, 826 A.2d 443, 451 (2003); *Valentine v. On Target,* 353 Md. 544, 551, 727 A.2d 947, 950 (1999) (emphasis added)).

We have defined duty as " 'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.' " *Muthukumarana,* 370 Md. at 486, 805 A.2d at 395 (quoting *Ashburn,* 306 Md. at 627, 510 A.2d at 1083). When determining the existence of a duty, we consider, among other things:

> "[T]he foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of

the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved."

*Ashburn,* 306 Md. at 627, 510 A.2d at 1083 (quoting *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 434, 131 Cal.Rptr. 14, 22, 551 P.2d 334, 342 (1976)). We have discussed the relationship between forseeability and duty and said:

"The fact that a result may be foreseeable does not itself impose a duty in negligence terms. This principle is apparent in the acceptance by most jurisdictions and by this Court of the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another, unless a 'special relationship' exists either between the actor and the third person or between the actor and the person injured."

*Ashburn,* 306 Md. at 628, 510 A.2d at 1083.

The seminal case in Maryland addressing the duty owed by police officers to the public is *Ashburn, supra.* In that case, an Anne Arundel County Police Officer encountered an individual in a convenience store parking lot sitting behind the wheel of a vehicle that had the engine running. The individual was intoxicated and it was agreed by the parties that he could have been charged with driving while intoxicated. The Anne Arundel County Police Officer determined that the individual was too impaired to drive, ordered him to park his car for the evening and not to drive it until the next day. After the officer left the scene, the driver of the vehicle drove away from the convenience store and collided with a pedestrian who, as a result of the collision, lost a leg and suffered other injuries. The pedestrian brought suit against the driver, the police officer, the Anne Arundel County Police Department, and Anne Arundel County. The basis for the suit against the officer, the department, and the county, according to the pedestrian, was that the police had a mandatory duty under state law to detain all intoxicated drivers. *Ashburn,* 306 Md. at 620, 510 A.2d at 1079. The trial court dismissed the case

against the officer, the police department, and the county, in part, because the officer owed no special duty to the pedestrian. We affirmed. *Id.* at 634, 510 A.2d at 1087.

After determining that the officer was acting in a discretionary capacity and defining duty in the context of negligence, we said that the duty "owed by the police by virtue of their positions as officers is a duty to protect the public...." *Id.* at 628, 510 A.2d at 1084. We then explained why that general duty to the public, in and of itself, does not create a special relationship with an individual:

> " '[P]ublic officials who act and react in the milieu of criminal activity where every decision to deploy law enforcement personnel is fraught with uncertainty must have broad discretion to proceed without fear of civil liability in the "unflinching discharge of their duties." *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949). As the Connecticut Supreme Court recognized the public interest is not served "by allowing a jury of lay (persons) with the benefit of 20/20 hindsight to second-guess the exercise of a police [officer]'s discretionary professional duty. Such discretion is no discretion at all." ' " *Shore v. Town of Stonington,* [187 Conn. 147, 444 A.2d 1379, 1381 (1982) ].

> \* \* \* \* \* \*

> ▇▇▇ " '[I]f the police were held to a duty enforceable by each individual member of the public, then every complaint—whether real, imagined, or frivolous would raise the spectre of civil liability for failure to respond. Rather than exercise reasoned discretion and evaluate each particular allegation on its own merits the police may well be pressured to make hasty arrests solely to eliminate the threat of personal prosecution by the putative victims.' " *Porter v. City of Urbana,* [ ] 88 Ill.App.3d [443,] [ ] 445, 43 Ill.Dec. [610,] [ ] 612, 410 N.E.2d [610,] [ ] 612 [(1980)]. Such a result historically has been viewed, rightly so, as untenable, unworkable and unwise.'

> "Furthermore, a policy which places a duty on a police officer to insure the safety of each member of the communi-

ty would create an unnecessary burden on the judicial system. Under such circumstances, the slightest error of a policeman would give rise to a potential lawsuit."

*Ashburn,* 306 Md. at 629–30, 510 A.2d at 1084 (quoting *Morgan v. District of Columbia,* 468 A.2d at 1311–12 (D.C.1983) (some citations omitted)). Thus, a police officer owes no duty to individual members of the community simply by virtue of the fact that he is a police officer.[8] In the present case, the "Believe Campaign," to the extent it created any duty at all, was a duty to the general public—not a duty to the individual members of the public.

 There are, however, circumstances under which a police officer may, by his or her affirmative acts, create a duty to a specific individual. Such a situation is known as a "special relationship." We have said that the "special duty rule" is a "modified application of the principle that although generally there is no duty in negligence terms to act for the benefit of any particular person, when one does indeed act for the benefit of another, he must act in a reasonable manner." *Williams v. Mayor and City Council of Baltimore,* 359 Md. 101, 144, 753 A.2d 41, 64–65 (2000) (quoting *Ashburn,* 306 Md. at 630–31, 510 A.2d at 1085). For there to be a special relationship, "it must be shown that the local government or the police officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the police protection." *Ashburn,* 306 Md. at 631, 510 A.2d at 1085.

 We affirmed the validity of the *Ashburn* test in *Muthukumarana* when we concluded there that in light of the "many different special relationship requirements adopted by other jurisdictions[,]" that the " 'intent of the "special relationship" doctrine is better addressed by our general standard outlined in *Ashburn'* because it preserves our ability to deter-

---

8. The duty owed by police officers is sometimes referred to as the "public duty doctrine." For a discussion of this subject using the term "public duty doctrine," *see Muthukumarana,* 370 Md. at 486–87, 805 A.2d at 395.

mine 'whether a special relationship exists' on a 'case-by-case basis.'" *Muthukumarana,* 370 Md. at 495, 805 A.2d at 401 (quoting *Williams,* 359 Md. at 150, 753 A.2d at 67–68). A special relationship may be established by a statute or rule, by a contractual or other private relationship, or be implied by virtue of the relationship between the tortfeasor and a third party. *Bobo v. State,* 346 Md. at 715, 697 A.2d at 1376 (1997). Absent a special relationship between the state and a victim, however, "liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers [or the government entity]." *Ashburn,* 306 Md. at 628, 510 A.2d at 1083. Thus, we must determine whether a special relationship existed between the appellees and the Dawson family based on well pled facts of the complaint. If there is no special relationship, there can be no duty owed to the Dawsons. Without the showing of a duty, there can be no relief.

Appellants argue that, when viewed in a light most favorable to them, they alleged sufficient facts below to show that a special relationship was established between the BCPD and the Dawsons. Specifically, they argue that the 911 and 311 calls were "continuous and systematic over a substantial period of time" and that the "BCPD officers affirmatively acted for the Dawsons' benefit and protection by repeatedly responding to 911 calls." They also argue that the BCPD affirmatively acted by promising to put the family on the "Special Attention List" and increasing the frequency of patrols by their house. With respect to the State, appellants argue that an Assistant State's Attorney's alleged verbal promise of protection was an affirmative act creating a special relationship.

The City argues that the only specific acts by the police that the appellants allege are the 911 calls and the subsequent police response. The calls were spread out over a period of time and none of them was directly connected to the firebombing of the house. The State argues that the Assistant State's Attorney's failure to act on an alleged promise for

protection cannot be characterized as an affirmative act negating the creation of a special relation; it was an omission.

As stated above, we determine the creation of a special relationship on a case-by-case basis. In the present case, it is unclear whether appellants are asserting that the 911 calls themselves created the special relationship or whether it was the police response to the 911 calls coupled with the promise to place the Dawson family on the special protection list that created a special relationship. Under either circumstance, we conclude that there was no special relationship.

With respect to any basis for a claim based on the 911 calls, our holding in *Muthukumarana* is dispositive. In that case, we addressed whether 911 operators were liable in tort to individuals in need of assistance. We held that a "911 employee generally owes no duty in tort for the negligent performance of his or her duties to an individual in need of emergency telephone services." *Muthukumarana,* 370 Md. at 492, 805 A.2d at 399. We also acknowledged that if an "individual plaintiff establishes that a 911 employee owed him or her a special duty, based on the existence of a special relationship between the two, the employee may be found liable to the individual in tort for the negligent performance of his or her duties." *Id.* We then applied the *Ashburn* test for special relationships, which required, in that context, the 911 employee to affirmatively act for the protection of a specific individual or group and for the individual or group to rely on the employee. *Id.* at 496, 805 A.2d at 401.

In the present case, there is no fact establishing a special relationship between the City and the Dawsons on the basis of the 911 calls. We stated in *Muthukumarana* that " 'neither a dispatcher's receipt of a call for help nor the dispatch of emergency assistance alone creates a special duty to the person in need of such assistance.' " 370 Md. at 498, 805 A.2d at 402 (quoting *Fried v. Archer,* 139 Md.App. 229, 260, 775 A.2d 430, 448 (2001)). In the present case, the fact that the 911 calls were answered numerous times and the police were dispatched numerous times does not alter the application

of this rule of law. Under these circumstances it is not sufficient to establish a special relationship or to create a special duty.

Appellant's argument with respect to the police response is equally unavailing. There simply is no allegation sufficiently pled showing that the police officers responding to the Dawson home affirmatively acted for the Dawson's benefit, that they did anything to induce the Dawson family to rely on them, or that they acted in any way differently than they would act responding to any complaint of any other member of the general public. Responding to the home on the basis of a 911 call was part of the police officers public duty, regardless of how many times they had to respond to that particular home. Appellants' allegations that the police stated that they would place the Dawsons on a Special Attention List do not give rise to a special relationship because that statement, in and of itself, does not indicate that the police affirmatively acted towards the Dawsons in any manner different than they would respond to any member of the general public. They responded generally. Thus, the first prong of the *Ashburn* test, requiring an affirmative act, is not met.

Even if the first prong of the *Ashburn* test were met, there is no indication that the Dawson's relied on the statement. In fact, appellants' acknowledgment that the Dawson family was preparing to move tends to show that they did not rely on any additional protection resulting from being placed on the Special Attention List. The only affirmative act, if any at all existed, was the action of the police in suggesting that the Dawsons move from the subject location. They were not injured because they took any action to move. They were injured because they stayed.

Keeping in mind that a special relationship only exists when an affirmative act and reliance are alleged, it is clear that there was no special relationship between the Dawson family and the Assistant State's Attorney who allegedly offered them protection but then failed to complete the paperwork. There was no affirmative act. There was only an

alleged omission by the Assistant State's Attorney. Appellants concede that "one may characterize the bulk of [the Assistant State's Attorney's] conduct as omissions—that is, failures to act as opposed to affirmative acts...." After making this concession, appellants do not reference any conduct by the Assistant State's Attorney which demonstrates the type of affirmative act necessary to create a special relationship. Therefore, no special relationship was formed between the Assistant State's Attorney and the Dawson family. Had the State's Attorney placed them in protective custody and then failed to protect them, a different analysis may have been necessary in that they may have been in custody.

We hold today that there was no special relationship between the City and the Dawsons and that there was no special relationship between the State and the Dawsons. This holding is consistent with the underlying public policy considerations present in *Ashburn, Williams, and Muthukumarana.* If we were to dramatically expand the potential liability that police and 911 operators are subject to, which might occur if we were to dilute or do away with the *Ashburn* test, it is very likely that the police would be hindered in respect to their response to the numerous calls for help that occur in this State on a daily basis. *See Ashburn,* 306 Md. at 629, 510 A.2d at 1084 (officers must be able to discharge their duties without fear of civil liability). Doing away with or watering down the affirmative act requirement of the special relationship test might result in inserting into the response to every emergency call the consideration of potential liability on the part of the officer or operator, before the officer completes his or her response and, in this context, it might slow down, if not in some cases, stop, the emergency response to emergency situations. *See Muthukumarana,* 370 Md. at 490, 805 A.2d at 398 (" '[f]or the courts to proclaim a new and general duty of protection in the law of tort, even to those who may be the particular seekers of protection based on specific hazards, could and would inevitably determine how the limited police resources of the community should be allocated and without predictable limits.' ") (quoting *Fried,* 139 Md.App. at 258, 775

A.2d at 447 (quoting *Riss v. City of New York*, 22 N.Y.2d 579, 293 N.Y.S.2d 897, 240 N.E.2d 860, 861 (1968))). We also recognized in *Muthukumarana* that "when emergency services are involved, 'the circumstances are often quite demanding and . . . some mistakes will occur, even when the service is well organized and conscientiously administered.' " 370 Md. at 490–91, 805 A.2d at 398 (quoting *DeLong v. County of Erie*, 60 N.Y.2d 296, 469 N.Y.S.2d 611, 457 N.E.2d 717, 722 (1983)). Thus, our decision to continue to limit the scope of liability in the present case, is consistent with the public policy reasons that have led us to apply the *Ashburn* test for special relationships in certain of our previous cases.

With respect to appellants' third issue presented, even if the allegations of the complaint could be established by discovery, for the reasons we have stated, the allegations would not suffice to establish a duty based upon a special relationship. It is the allegations themselves that are insufficient.

## IV. Conclusion

For the foregoing reasons, we hold that the Circuit Court for Baltimore City was correct as a matter of law when it found that the state-created danger theory did not apply under the circumstances of this case. We also hold that a special relationship did not exist between the appellees and the Dawson family. We further hold that the trial court did not err in dismissing the case prior to discovery being conducted.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**