REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 01475

September Term, 2015

_____

WILLIAM H. TORBIT, SR., et al.

v.

BALTIMORE CITY POLICE
DEPARTMENT, et al.

_____

Krauser, C.J.,
Friedman,
Sharer, J. Frederick
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Friedman, J.

_____

Filed: February 2, 2017

Two people were killed and several others were injured when the Baltimore Police Department ("BPD") responded to an "active shooter"[1] situation outside a nightclub in Baltimore City. We are first asked to determine whether the Police Department, the Club, and an adjoining parking lot's owner and operator may be liable for actions prior to the shooting. For a variety of reasons described below, we affirm the trial court's rulings in favor of those appellees. We are then asked to determine whether the trial court erred in granting judgment in favor of the four police officers who fired their guns at the shooter. We affirm the trial court's finding that no reasonable juror could find that the officers were grossly negligent.

## BACKGROUND

On January 9, 2011, the BPD was called to the Select Lounge nightclub, located on Baltimore City's North Paca Street, after several fights had broken out inside the nightclub. On arrival, Major Marc Partee decided to close the club early and send its patrons home. Police set up a perimeter around the club and an adjacent parking lot frequently used by guests of, although not owned by, the Select Lounge.

After the closing, Jazzmin Graves, a patron of the Select Lounge, was walking across the parking lot when she was hit by a car pulling out of the lot. Although Ms. Graves was not harmed, an argument erupted between occupants of the car and Ms. Graves and

---

[1] "An 'active shooter' is an individual actively engaged in killing or attempting to kill people in a populated area." FBI, *Active Shooter Incidents*, https://perma.cc/P4AB-CUQH.

her friends. Because the car was blocking traffic, a man in dark clothing—specifically in black jeans, hat, boots, and a black "hoodie" sweatshirt—approached the group. The man told the two groups to stop arguing and to leave the parking lot. The car drove off the lot.

Another patron, later identified as Sean Gamble, however, took exception to the dark-clothed man's actions. Gamble "got up in" the dark-clothed man's face and expressed his view that the man shouldn't be "putting [his] hands on a female." The dark-clothed man told Gamble to "mind your own fucking business." While they argued, another man, later identified as Darrell "Rico" Baker, sucker-punched the dark-clothed man. More men joined the fray, knocking the dark-clothed man to the ground and began "stomping[,] kicking[,] and punching" him.

The dark-clothed man then pulled and fired a gun.

Officer Harry Pawley testified that the dark-clothed man fired a few shots, paused briefly, and then resumed shooting:

> Q: When did you withdraw your service weapon?
>
> A: I was putting my mace away, I heard gunshots. I looked up, more gunshots. I saw an individual on the ground shooting and that's at which time I withdrew my weapon and fired.

Further:

> Q: When you witnessed [the dark-clothed man] shooting, he was laying on his back shooting up into the air, wasn't he?
>
> A: No. He was laying on his back shooting, like, his arm moving from side to side, discharging.

Officer Harry Dodge testified that, after hearing initial shots, he looked up and saw the dark-clothed man fire shots toward Franklin Street, a cross street of North Paca:

> Q: Was the individual firing his weapon … into the air indiscriminately?
>
> A: He was firing towards Franklin Street indiscriminately with his arm parallel to the ground.
>
> Q: It wasn't into the air?
>
> A: Not the second time he started shooting, no. The first time he started shooting, I don't recall which direction he was firing. The second time he began firing again, he was indiscriminately [shooting] towards Franklin street where a group of people were.

Officer Latora Craig testified that she heard several initial shots, saw the men who had attacked the dark-clothed man begin to run, and saw that the dark-clothed man began to fire again indiscriminately:

> Q: … And the shots that were fired by that person that you saw they were all going towards Franklin Street. Correct?
>
> A: They were going in different directions, he had no aim. Some were straight up, some were down. They were back-and-forth.

Officer Craig further testified that the initial shots "went past [her] legs and [her] feet."

Finally, Officer Toyia Williams testified that she heard rapid gunfire nearby, observed about 20 to 30 people between her and the shooter, identified a muzzle flash from the shooter's gun, and then fired her weapon at the shooter.

Both the dark-clothed man and Sean Gamble were fatally wounded. Jazzmin Graves and two other patrons, Katrina Harris and Jamie Jordan, suffered minor gunshot wounds.

The dark-clothed man was later identified as BPD Officer William Torbit.

## PROCEEDINGS BELOW

Several lawsuits were filed and consolidated in the Circuit Court for Baltimore City. Plaintiffs were Katrina Harris, Jazzmine Graves, Jamie Jordan, the Estate of William Torbit, and the Estate of Sean Gamble. Defendants were the Select Lounge, its owner and manager,[2] the parking lot owner Shell Realty, Inc., the parking lot operator PMS Parking, Inc., the BPD, former Commissioner Frederick Bealefeld, Major Partee, Lieutenant Charles Clayton (Torbit's partner), and BPD Officers Pawley, Dodge, Craig, and Williams.

Claims against Commissioner Bealefeld and the BPD were dismissed. Summary judgment was entered in favor of Select. A jury trial commenced regarding the remaining claims but the trial court, at the conclusion of the plaintiffs' case, granted motions for judgment in favor of the remaining defendants. The plaintiffs noted this appeal.

## DISCUSSION

We have reorganized the appellate issues according to their procedural posture. Pursuant to that organization, Appellants first argue that the trial court erred in granting Commissioner Bealefeld and the BPD's motions to dismiss. Next, they argue that the trial

---

[2] The Select Lounge, its owner, and manager will be collectively referenced as "Select" herein.

- 4 -

court erred in granting summary judgment in favor of Select. Finally, they argue the trial court erred in granting motions for judgment in favor of PMS, Shell, Major Partee, Lieutenant Clayton, and the four police officers who fired their guns.

## I.    Motions To Dismiss

Appellants assert the trial court erred in dismissing their tort claims against Commissioner Bealefeld and the BPD. Appellants argue that Commissioner Bealefeld and the BPD owed a duty to protect the public from harm. That duty, they claim, arises out of a special relationship between the public, the BPD, and Commissioner Bealefeld. Appellees argued below and in this Court that Commissioner Bealefeld and the BPD owed no duty of care to Appellants.

The standard of review of a grant of a motion to dismiss is "whether the trial court was legally correct." *Litz v. Maryland Dep't of Env't*, 446 Md. 254, 264 (2016). We "must determine whether the [c]omplaint, on its face, discloses a legally sufficient cause of action." *Pittway Corp. v. Collins*, 409 Md. 218, 234 (2009). In reviewing the complaint, we "accept all well-pled facts in the complaint, and reasonable inferences drawn from them, in a light most favorable to the non-moving party." *Litz*, 446 Md. at 264. "Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff." *O'Brien & Gere Engineers, Inc. v. City of Salisbury*, 447 Md. 394, 403-04 (2016) (citations omitted).

In a negligence action, "a plaintiff must allege facts demonstrating (1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty." *McNack v. State*, 398 Md. 378, 394 (2007) (quoting *Remsburg v. Montgomery*, 376 Md. 568, 582 (2003)) (internal quotations omitted). Thus, in a case based in negligence, as we have here, we begin by identifying whether a legally cognizable duty exists. *Id.* at 396. The Court of Appeals of Maryland has explained that police do not owe an enforceable tort duty to the public at large. *Muthukumarana v. Montgomery Cnty.*, 370 Md. 447, 486 (2002) ("[W]hen a statute or common law imposes upon a public entity a duty to the public at large, and not a duty to a particular class of individuals, the duty is not one enforceable in tort.") (Internal quotations omitted). A duty may arise between police and an individual, however, when there is a "special relationship." *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 143 (2000) (explaining that, "absent a 'special relationship' between police and victim, liability for failure to protect an individual citizen against injury caused by another citizen does not lie against police officers"). Thus, Appellants can recover against Commissioner Bealefeld and the BPD only if they plead and prove the existence of a special relationship. "[F]or a special relationship between police officer and victim to be found, [a plaintiff] must [show] that the local government or the police officer affirmatively acted to protect the *specific* victim or a *specific* group of individuals like the victim, thereby

inducing the victim's *specific* reliance upon the police protection." *Fried v. Archer*, 139 Md. App. 229, 250-51 (2001) (emphasis added) (citations omitted).

Here, Appellants have not pleaded facts in their complaint that allege Commissioner Bealefeld or the BPD affirmatively acted to protect Appellants from harm, or that Appellants were specifically relying on protection from Commissioner Bealefeld or the BPD. They try to bridge that gap by alleging that Commissioner Bealefeld and the BPD failed to act. Thus, Katrina Harris and Jazzmin Graves alleged that Commissioner Bealefeld and the BPD "*fail[ed]* to establish and/or implement adequate policies, rules and/or guidelines, and/or adequately train and/or prepare its … employees in operational realities … relating to … crowd control." Sean Gamble similarly alleged that Commissioner Bealefeld "*failed* … to use proper care in selecting, supervising, training, and or retaining their employees." But failure to act, by definition, cannot satisfy the requirement of an "affirmative act." As a result, because there was no affirmative act to create such a relationship, no special relationship existed between Commissioner Bealefeld and Appellants nor between the BPD and Appellants.[3] Consequently, Commissioner

---

[3] Appellants suggest that Torbit, by virtue of his employment as a BPD officer, had a special relationship with the BPD, thus creating a duty of care. Torbit's complaint alleged that the BPD had a duty to, among other things, "conduct a specific policy addressing the type of attire necessary for plainclothed officers." Appellants have not, however, pleaded facts alleging that BPD affirmatively acted to protect Torbit from harm or that Torbit specifically relied on its protection. Therefore, no special relationship existed and no duty of care arose.

Bealefeld and the BPD owed Appellants no duty of care.[4] Because Appellants have not provided allegations and facts that, if proven, would be sufficient to afford relief, we hold that the trial court did not err in dismissing claims against Commissioner Bealefeld and the BPD.[5]

## II. Summary Judgment

Appellants argue that the trial court erred in granting summary judgment in favor of Select because Select violated a duty of care owed to nightclub patrons. Appellants claim that Select's knowledge of criminal activity in the neighborhood, over-promotion, allowance of overcrowding, and lack of security created a dangerous condition that was the proximate cause of Appellants' injuries. Select disputes that it owed a duty of care but also argues that, even if it did and violated that duty, the police shooting was a superseding cause of Appellants' harm. The trial court found that "even if [the] Court is to consider

---

[4] Appellants also contend that Commissioner Bealefeld and BPD are liable—by way of the doctrine of respondeat superior—for constitutional violations allegedly committed by BPD police officers in this case. Because we affirm the trial court's judgment in favor of all BPD police officers involved here, none of the officers can be found liable. *See infra*, Part III. We, therefore, do not need to address Appellants' respondeat superior argument.

[5] Appellants further argue that the trial court erred by improperly striking their motion for reconsideration of the trial court's grant of Commissioner Bealefeld and the BPD's motion to dismiss. Rule 2-534 provides that a trial court, "on motion of any party filed within ten days after entry of judgment, … may amend the judgment, or may enter a new judgment." Md. Rule 2-534. Here, Appellants filed their motion for reconsideration 7 months after the entry of judgment. Appellants' motion was therefore untimely and properly stricken. Moreover, Appellants have not explained how, had the trial court considered their untimely motion for reconsideration, the outcome would have changed. As a result, we affirm the trial court's striking of Appellants' motion for reconsideration.

[Select] a tortfeasor, [the] ensuing chain of events was not foreseeable." Moreover, "the end result of a fatal police shooting was clearly not foreseeable."

A trial court "shall enter [summary] judgment in favor of or against the moving party if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). We apply a *de novo* standard of review in determining whether the trial court correctly entered summary judgment. *Roy v. Dackman*, 445 Md. 23, 39 (2015).

Even if we assume that Select owed a duty to Appellants, we agree with the trial court that Select was not the proximate cause of Appellants' injuries. That is because an intervening act—Torbit's firing of his gun—broke the causal link between any action by Select and Appellants' injuries. A "defendant's negligence is not deemed the proximate cause of the injury, when the connection is thus actually broken by a responsible intervening cause." *Sindler v. Litman*, 166 Md. App. 90, 116 (2005) (citations omitted). "An intervening force is a superseding cause if the intervening force was not foreseeable at the time of the primary negligence." *Id.* at 115.

Here, Torbit firing his gun was an intervening force and superseding cause of Appellants' injuries. Even if Select knew of crime in the area, knew that the nightclub was overcrowded, knew that the nightclub was over-promoted, and failed to hire adequate security, it could not foresee that Torbit, a plainclothes BPD officer, would fire his weapon

in a nearby parking lot. Because there is no genuine dispute of material fact regarding whether Torbit firing his gun was an intervening force and superseding cause, we hold that the trial court correctly granted summary judgment in Select's favor.[6]

## III.    Motion for Judgment

Appellants contend that the trial court erred when —at the conclusion of Appellants' case but prior to the case being submitted to the jury—it granted motions for judgment in favor of the remaining Appellees. We will begin by analyzing the trial court's grant of judgment in favor of Shell and PMS. We then address, in turn, the trial court's grant of judgment in favor of Major Partee, Lieutenant Clayton, and the remaining police officers.

"We review the trial court's grant of [a] motion for judgment *de novo*, considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." *Thomas v. Panco Mgmt. of Maryland, LLC*, 423 Md. 387, 393-94 (2011) (citations omitted); *see also* Md. Rule 2-519. A case must be submitted to a jury for consideration if any evidence is legally sufficient to create a jury question. *Lowery v. Smithsburg Emergency Med. Serv.*, 173 Md. App. 662, 683 (2007).

---

[6] Appellants filed suit against Select's owners and manager as well. Assuming that Select's owners and manager could be held liable for tortious conduct relating to operation of the nightclub, we would find, as we found with Select, that an intervening act was a superseding cause of Appellants' injuries.

A.    Shell & PMS

Appellant Sean Gamble contends that Shell, the parking lot owner, and PMS, the parking lot operator, violated a duty of care by failing to protect Gamble from harm. Both Shell and PMS argue that the police shooting was unforeseeable and therefore they were not the proximate cause of Gamble's injuries.

"It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of the harm alleged.'" *Pittway*, 409 Md. at 243 (quoting *Stone v. Chicago Title Ins.*, 330 Md. 329, 337 (1993)). "Proximate cause involves a conclusion that someone will be held legally responsible for the consequences of an act or omission." *Id.* (Internal quotations and citations omitted). To prove proximate causation, a plaintiff must establish legal causation. *Id.* at 245. "[L]egal causation most often involves a determination of whether the injuries were a foreseeable result of the negligent conduct." *Id.* at 246. A "defendant may not be liable if it appears highly extraordinary and unforeseeable that the plaintiff['s] injuries occurred as a result of the defendant['s] alleged tortious conduct." *Id.* at 247

Here, the trial court found that "there [was] no evidence that it was foreseeable to [PMS and Shell] that Mr. Gamble would involve himself in an incident on the lot, and end up entangled with Officer Torbit, and ultimately be shot by either Officer Torbit or the other defendant police officers." Moreover, "the shooting was an extraordinary event, and not foreseeable under these circumstance." We agree. Appellants have not presented any

evidence to support a jury finding that Shell or PMS could have foreseen Gamble getting

involved in a skirmish on the lot nor the subsequent police shooting. Therefore, we affirm

the trial court's grant of judgment in favor of Shell and PMS.[7]

## B. The Police Officers on Scene

Appellants contend that there was sufficient evidence that Major Partee, Lieutenant

Clayton, and police officers Pawley, Dodge, Craig, and Williams were grossly negligent[8]

and, therefore, that the trial court erred in finding that there were no factual disputes for the

jury to resolve.

We begin by noting that gross negligence is not just "big negligence." Rather, gross

negligence is:

> [A]n intentional failure to perform a manifest duty in reckless
> disregard of the consequences as affecting the life or property
> of another, and also implies a thoughtless disregard of the
> consequences without the exertion of any effort to avoid them.
> Stated conversely, a wrongdoer is [liable] of gross negligence
> or acts wantonly and willfully only when he inflicts injury

[7] In their brief, Appellants argue the trial court erred in prohibiting testimony regarding various other crimes in the vicinity of the parking lot. Because we affirm the trial court's finding that the police shooting was not foreseeable, and do not think that any additional evidence of criminal activity near the parking lot would have made the police shooting foreseeable, we need not address those arguments.

[8] Appellants alleged various theories of liability sounding in tort and constitutional violations against Major Partee, Lieutenant Clayton, and the four police officers who fired their guns: Dodge, Pawley, Craig, and Williams. Appellants, however, have—with the exception of constitutional claims against Major Partee—argued regarding only gross negligence, and have therefore waived issues related to their other claims. *See Moats v. City of Hagerstown*, 324 Md. 519, 525 (1991) (explaining that "[t]he failure of an appellant to raise an issue in the appellate court is usually deemed a waiver as to the issue").

intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist.

*Barbre v. Pope*, 402 Md. 157, 187 (2007) (citations omitted); *see also Shoemaker v. Smith*, 353 Md. 143, 164 (1999) (explaining that gross negligence is akin to "reckless or wanton conduct"). Here, to reverse the trial court's grant of judgment, there must be legally sufficient evidence to support a jury finding that Appellees were grossly negligent. We take the Appellees separately.

### i.        *Major Partee*

Appellants contend Major Partee was grossly negligent in the manner in which he managed the nightclub's early closing. They produced an expert witness, Dr. Tyrone Powers, who testified: (1) that a supervising officer has a duty to give orders and make sure those orders are carried out; (2) that, in his opinion, no perimeter was set up outside the club and; (3) that Major Partee failed to give adequate instruction to Officer Torbit as a plainclothes police officer. Appellants argue that each of these failures violated the standard of care.

The question here, however, is not whether Major Partee violated a standard of care, but rather whether a reasonable juror could conclude that Major Partee's conduct strayed so grossly from the ordinary standard of care as to support a finding of utter indifference to the rights of other. *See Barbre*, 402 Md. at 187. We necessarily focus, therefore, on whether, under the circumstances, Major Partee's actions showed utter disregard for the safety and rights of others. We affirm the trial court's finding that Appellants' did not

present sufficient evidence to support any inference of gross negligence. Major Partee may have failed to properly command his subordinate police officers, but there was no evidence that he didn't instruct them because he didn't care. He may have failed to set up a perimeter, but there was no evidence that this failure amounted to gross disregard for the lives of Appellants. He may not have adequately instructed Officer Torbit on how to behave while Torbit was in plainclothes, but there is no evidence that this was because he had reckless disregard for Torbit's safety. Thus, even if we were to accept Appellants' factual assertions that Major Partee failed to act in these several respects, we agree with the trial court that no reasonable juror could find his conduct constituted gross negligence.

Finally, Appellants make an incomplete argument that Major Partee violated their constitutional rights—protected by Articles 16[9] and 25[10] of the Maryland Declaration of Rights—against "cruel and unusual pains and penalties" and "cruel or unusual

---

[9] Article 16 of the Maryland Declaration of Rights provides:

> That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter.

Md. Const. Decl. of Rts. art. 16.

[10] Article 25 provides "[t]hat excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law." Md. Const. Decl. of Rts. art. 25.

punishments." Maryland courts have historically treated these provisions as providing the same protection as the Eighth Amendment to the United States Constitution.[11] *See, e.g., Harris v. State*, 312 Md. 225, 237 n.5 (1988); *see also* Dan Friedman, THE MARYLAND STATE CONSTITUTION: A REFERENCE GUIDE 42-44, 61-62 (Oxford ed. 2011) (and cases cited therein). Federal courts have consistently held that the Eighth Amendment's prohibition on "cruel and unusual punishments" applies only after conviction, not before. *See, e.g., Rish v. Johnson*, 131 F.3d 1092, 1096 (4th Cir. 1997) ("The Eighth Amendment prohibits the infliction of cruel and unusual punishment on one convicted of a crime.") (Emphasis in original). Appellants have failed to explain why they believe Articles 16 and 25 of the Maryland Declaration of Rights should be given a divergent interpretation from that given to the Eighth Amendment. *See* Dan Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights*, 71 TEMPLE L. REV. 637, 645 (1998) ("How to Create an Argument").[12] In the absence of such an argument, we must deny relief.

---

[11] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

[12] *Miles v. State* provides an outstanding (albeit unsuccessful) example of how an appellant might craft an argument for an independent interpretation of the Maryland Declaration of Rights, in that case, regarding Article 16. 435 Md. 540 (2013). For additional materials on Article 16, *see* 71 TEMPLE. L. REV. at 656, 692-93 n.272-81; Dan Friedman, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary-Era State Declarations of Rights of Virginia, Maryland, and Delaware*, 33 RUTGERS L.J. 929, 1018 (2002). For additional materials concerning Article 25, *see* 71 TEMPLE L. REV. at 660, 698-99 n.380-89; 33 RUTGERS L.J. at 968.

### ii.  Lieutenant Clayton

Appellants contend that the trial court erred in granting judgment in favor of Lieutenant Clayton, Officer Torbit's partner, because they claim there were several questions of material fact for the jury to consider. Appellants have not shown and it is not clear to us, however, what claims those allegedly disputed facts would support. "Appellate courts cannot be expected to either (1) search the record on appeal for facts that appear to support a party's position, or (2) search for the law that is applicable to the issue presented." *Ruffin Hotel Corp. of Maryland v. Gasper*, 418 Md. 594, 618 (2011) (citations omitted). We, therefore, affirm the trial court's grant of judgment in favor of Lieutenant Clayton.[13]

### iii.  Remaining Police Officers

Finally, Appellants argue that the trial court improperly resolved the issue of whether the four police officers who fired their guns—Pawley, Dodge, Williams, and Craig—were grossly negligent. In support of this contention, Appellants insist that a jury could have decided that the police officers' alleged violation of police training and policy, and decision to fire their guns, amounted to gross negligence. Appellees generally argue that the officers acted reasonably in response to an active shooter situation. The trial court

---

[13] Even if we construed Appellants' arguments as a challenge to the trial court's finding that there was no evidence sufficient to create a jury question of gross negligence, we would affirm. Appellants allege that Lieutenant Clayton "abandoned Officer Torbit almost immediately once [Clayton and Torbit] entered the nightclub" and thus failed to supervise his partner, knowing that Torbit was in plainclothes. As the trial court explained, however, "there was no evidence that it was against any police procedure for Officer Torbit to work alone."

found that appropriate deference must be given to police—especially when they are making "difficult and extremely quick decisions in split second circumstances of high stress and of an emergency nature"—and therefore entered judgment in favor of the four police officers.

The Court of Appeals of Maryland has, following United States Supreme Court precedent, explained that excessive force claims against police officers are to be analyzed under Fourth Amendment jurisprudence. *Richardson v. McGriff*, 361 Md. 437, 452 (2000) (citing *Graham v. Connor*, 490 U.S. 386 (1989)). In *Richardson*, the Court explained the relevant inquiry regarding claims of excessive force:

> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. … The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 465 (citations omitted); *see also Boyer v. State*, 323 Md. 558, 589 (1991) ("[T]he police officer's conduct should be judged not by hindsight but should be viewed in light of how a reasonably prudent police officer would respond faced with the same difficult emergency situation."). The Court further explained the Fourth Amendment "does not allow [a] 'Monday morning quarterback' approach because it only requires that the seizure fall within a range of objective reasonableness." *Richardson*, 361 Md. at 455 (citing *Schulz v. Long*, 44 F.3d 643, 649 (8th Cir. 1995)). Moreover:

> The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under the Fourth Amendment. Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent), such as waiting for a supervisor or the SWAT team, are simply not relevant to the reasonableness inquiry.

*Richardson*, 361 Md. at 455 (quoting *Schulz*, 44 F.3d at 649). The *Richardson* Court concluded that that principle of reasonableness "is the appropriate one to apply" to excessive force claims brought under common law claims for gross negligence. *Richardson*, 361 Md. at 452.

Here, it is undisputed: (1) that the parking lot was dark; (2) that a dark-clothed man randomly fired shots in a group within the parking lot; (3) that a group a people were around the dark-clothed man when he started firing; (4) that when the dark-clothed man began firing a weapon, police officers did not know he was a fellow police officer; and (5) that four police officers fired their guns at what they perceived to be an active shooter. The shooter posed an active danger to the public and law enforcement. A jury might question the four police officers' decision to fire their weapons. As the trial court explained, however, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with 20/20 hindsight."

Therefore, even making all reasonable inferences in favor of Appellants, we affirm the trial court's grant of judgment in favor of Officers Pawley, Dodge, Craig, and Williams.[14]

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**

---

[14] Appellants' further argue that the trial court failed to consider the individual reasonableness of each police officer in firing their weapons. In support, Appellants point to the fact that several other police officers on the scene did not fire their weapons. This argument is unavailing. As the trial court explained, even if other police officers didn't fire their weapons, "what each of the other officers independently perceived in those few moments" has no bearing on the question of the reasonableness of these four officers. We agree.