80 A.3d 242

Jody Lee MILES

v.

STATE of Maryland.

No. 36, Sept. Term, 2012.

Court of Appeals of Maryland.

Nov. 25, 2013.

542

Brian Saccenti, Chief Attorney (Paul B. DeWolfe, Public Defender, and Marc A. DeSimone, Jr., Assistant Public Defender, of Baltimore, MD; Robert W. Biddle of Nathans & Biddle LLP of Baltimore, MD; Erika Alsid Short of Chason,

Rosner, Leary & Marshall, LLC of Towson, MD) on brief, for Appellant.

James E. Williams, Assistant Attorney General (Douglas F. Gansler, Attorney General of Maryland, of Baltimore, MD) on brief, for Appellee.

HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD, BELL,[*] LAWRENCE F. RODOWSKY (retired, specially assigned), JJ.

RODOWSKY, J.

The appellant, Jody Lee Miles (Miles), is a convicted murderer who was condemned to death by a jury in the Circuit Court for Queen Anne's County on March 19, 1998. After numerous reviews,[1] Miles, in July 2011, filed a second motion to correct his sentence, claiming that it was illegal.[2]

Miles asserts that his sentence is illegal because the Maryland death penalty statute violates the Declaration of Rights (MDR) Article 16, which reads:

---

[*] Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

**1.** The conviction and sentence were affirmed by this Court. *Miles v. State*, 365 Md. 488, 781 A.2d 787 (2001), *cert. denied*, 534 U.S. 1163, 122 S.Ct. 1175, 152 L.Ed.2d 118 (2002). His initial petition for post-conviction relief, as supplemented, was denied August 21, 2006. This Court denied leave to appeal. *Miles v. State*, 397 Md. 352, 918 A.2d 441, *cert. denied*, 552 U.S. 883, 128 S.Ct. 291, 169 L.Ed.2d 140 (2007). His initial motion to correct an illegal sentence, filed August 10, 2007, was denied January 3, 2008. This Court affirmed that denial. *Miles v. State*, 421 Md. 596, 28 A.3d 667 (2011), *cert. denied*, —— U.S. ——, 132 S.Ct. 1743, 182 L.Ed.2d 535 (2012).

**2.** By the Acts of 2013, Chapter 156, the General Assembly repealed the death penalty, effective October 1, 2013. Adoption of that legislation does not moot this appeal under the savings of penalties provision in Maryland Code (1957, 2011 Repl.Vol.), Article 1, § 3. Chapter 156 amends Maryland Code (1999, 2008 Repl.Vol. and 2012 Cum.Supp.), § 7–601(a)(1) of the Correctional Services Article by authorizing the Governor to "change a sentence of death into a sentence of life without the possibility of parole," but, as of this writing, that provision has not been invoked.

"That sanguinary Laws ought to be avoided as far as it is consistent with the safety of the State; and no Law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time, hereafter."

Appellant's principal position is that, on November 3, 1776, when the Maryland Constitutional Convention adopted our first Constitution and Declaration of Rights, then MDR Article 14, by its reference to "sanguinary laws," abolished capital punishment, subject to the State safety exception, without regard to the nature of the crime or the method of imposition of that punishment. Article 14 read:

"That sanguinary laws ought to be avoided, as far as is consistent with the safety of the State; and no law to inflict cruel and unusual pains and penalties ought to be made in any case, or at any time hereafter."

D. Friedman, *The History, Development, and Interpretation of the Maryland Declaration of Rights,* 71 Temp. L.Rev. 637, 656 (1998) (Friedman–Temple).

Miles also contends that his sentence is illegal because it violates MDR Article 24, which provides:

"That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

That argument is directed to the provision in the death penalty statute under which his jury determined "whether, by a preponderance of the evidence, the aggravating circumstances outweigh[ed] the mitigating circumstances." Maryland Code (1957, 1996 Repl.Vol.), Article 27, § 413(h)(1), more recently Maryland Code (2002, 2012 Repl.Vol.), § 2–303(i)(1) of the Criminal Law Article.[3]

The circuit court denied Miles's motion, and he noted this appeal. He presents two questions:

---

3. This section was repealed by Chapter 156 of the Acts of 2013.

"1. Is Mr. Miles' death sentence unconstitutional and illegal under the 'sanguinary Laws' clause of Article 16 of the Maryland Declaration of Rights?

"2. Is Mr. Miles' capital sentence illegal where the jury did not find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors?"

We shall affirm for the reasons set forth below.

## Motion to Dismiss

The State has moved to dismiss the appeal.

■ Maryland Rule 4–345(a) provides that "[t]he court may correct an illegal sentence at any time." The State correctly observes that Miles's use of Rule 4–345(a) is not within the letter of our previously decided cases. We have indicated, however, that a sentence may be reviewable under Rule 4–345(a) where a United States Supreme Court decision, promulgated after sentencing, announces a new judicial interpretation of a constitutional provision that brings into question the validity of the statute on which the sentence is based. *See Evans v. State,* 396 Md. 256, 272, 914 A.2d 25, 34–35 (2006), *cert. denied,* 552 U.S. 835, 128 S.Ct. 65, 169 L.Ed.2d 53 (2007). If the death penalty statute does not comply with the Declaration of Rights, the statute fails, and with it, the sentence. Here, Miles asks this Court to declare a constitutional rule of first impression. We hold that this issue of substantive constitutional law is within Rule 4–345(a).

■ We conclude otherwise with respect to the dismissal of Miles's appeal on the second issue. His contention is not within Rule 4–345(a) for the reasons ably stated by the circuit court.

"As noted *supra,* Defendant challenged this weighing procedure in his August, 2007 motion to correct illegal sentence. In that motion, defendant primarily relied on *Cunningham v. California,* 549 U.S. 270 [127 S.Ct. 856, 166 L.Ed.2d 856] (2007), a U.S. Supreme Court decision that was published in January, 2007. Defendant argued that, pursuant to *Cunningham,* Maryland's capital sentencing

scheme violates the Sixth Amendment unless it requires that aggravating factors outweigh mitigating factors beyond a reasonable doubt. Defendant additionally asserted that the sentencing procedure violates Article 21 of the Maryland Declaration of Rights. *See* MD.CODE, ANN., CONST. Art. 21 (2003, 2011 Supp.).

"This Court denied the motion on January 4, 2008. Defendant timely appealed. Significantly, Defendant never explicitly raised the issue of the constitutionality of the weighing procedure under the Declaration of Rights. Rather, Defendant focused his argument on the Sixth Amendment. For reasons not directly pertinent to the issues currently before this Court, the Court of Appeals affirmed the denial of Defendant's motion, holding that 'Maryland's capital sentencing procedure does not violate [the] Sixth Amendment.' *Miles v. State,* 421 Md. 596, 607 [28 A.3d 667, 673] (2011). The Court did not address the sentencing procedure's constitutionality with respect to the Maryland Declaration of Rights.

"Defendant's current motion, again, challenges the sentencing procedure under the Declaration of Rights. Defendant concedes that although Article 21 was mentioned in the 2007 motion, the Declaration of Rights issue was not explicitly raised before the Court of Appeals. Defendant now 'requests that this Court vacate his sentence of death on the ground that permitting the death sentence based on a jury finding by a preponderance of the evidence that the aggravating factors outweighed the mitigating factors violated the Maryland Declaration of Rights.' Revised Supplemental Motion at 2. This time, Defendant primarily relies on Article 24 of the Declaration of Rights which provides, in pertinent part, that 'no man ought to be ... deprived of his life ... but by the judgment of his peers, or by the Law of the land.' MD.CODE ANN., CONST. Art. 24. (2003, 2011 Supp.).

\* \* \*

"Defendant cites no new judicial interpretation in the case at bar. Consequently, Defendant's motion may be cognizable under Rule 4–345(a) only under the general rule, where

the alleged error resulted in illegality of the sentence itself. Defendant's Article 24 argument does not challenge the inherent illegality of his death sentence. Rather, it alleges error in the underlying *procedure* that resulted in the sentence. 'The notion of an "illegal sentence" ... deals with substantive law, not procedural law.' *Corcoran v. State*, 67 Md.App. 252, 255 [507 A.2d 200, 202] (1986). An error in a sentencing procedure, even if it is of a constitutional dimension, may very well result in an inherently and substantively legal sanction. *Cf. State v. Wilkins*, 393 Md. 269, 275 [900 A.2d 765, 769] (2006) (citing *Randall [Book Corp. v. State* ], 316 Md. [315], 323 [558 A.2d 715, 719 (1989) ] ) ('An error committed by the trial court during the sentencing proceeding is not ordinarily cognizable under *Rule 4–345(a)* where the resulting sentence or sanction is itself lawful.'); *Evans* [396 Md. at 271–72, 914 A.2d at 34]. Indeed, 'a sentence, proper on its face, [does not] become[ ] an "illegal sentence" because of some arguable procedural flaw in the sentencing procedure.' *Corcoran*, 67 Md.App. at 255 [507 A.2d at 202]. Therefore, the motion to correct an illegal sentence is not an appropriate vehicle to address Defendant's Article 24 argument.

"The Court's decision is consistent with the narrow scope of the motion to correct illegal sentence. *See Tshiwala [v. State* ], 424 Md. [612], 619 [37 A.3d 308, 312 (2012) ]. A [Rule] 4–345(a) motion is generally cognizable only where there is no conviction warranting any sentence, *see, e.g., Ridgeway v. State*, 369 Md. 165 [797 A.2d 1287] (2002), or where the sentence exceeds the limits imposed by law, *see, e.g., Matthews [v. State* ], 424 Md. 503 [36 A.3d 499 (2012) ]. *See Chaney v. State*, 397 Md. 460, 466 [918 A.2d 506, 509–10] (2007). Because imposing a punishment under these circumstances is particularly egregious, Rule 4–345(a) 'creates a limited exception to the general rule of finality, and sanctions a method of opening a judgment otherwise final and beyond the reach of the court.' *State v. Griffiths*, 338 Md. 485, 496 [659 A.2d 876, 882] (1995). In all other cases, the interests of finality outweigh a defendant's interests in

challenging alleged errors beyond a direct appeal and a post-conviction petition."

(Footnotes omitted).

Because Miles's second contention is not cognizable under Rule 4–345(a), the circuit court was correct in denying relief under that rule on the preponderance argument. That does not result, however, in a dismissal of the appeal on that issue. Rather, we shall affirm.

## Parties' Contentions

### *Miles's Submission*

The principal argument advanced by Miles is that, textually, Article 14 of the 1776 MDR abrogated capital punishment. The argument consists of four steps, which we have reordered.

1. "A 'sanguinary law' is a law authorizing the imposition of the death penalty";

2. "The word 'ought' means 'shall' ";

3 " '[T]o be avoided' means 'to be refrained from' or 'to be made void' "; and

4. "The phrase 'as far as is consistent with the safety of the State' means 'unless necessary for the security of the State of Maryland.' " [4]

■ Miles undertakes, in the major portion of his brief, to demonstrate that, in 1776, the well understood meaning of "sanguinary," particularly when modifying "laws," was capital punishment. His hypothesis is that, in 1776, the constitutional convention proscribed capital punishment for any offense,

---

4. The Press had reported that there was an effort to petition Chapter 156 of the Acts of 2013 to referendum, under Maryland Constitution, Article XVI. On July 3, 2013, after it had become clear that no referendum petition had been filed, Miles applied to this Court for leave to file a supplemental brief arguing that the repeal of the death penalty evidenced that the death penalty, as a "sanguinary" law, is not necessary for the safety of the State. We granted that request on August 14, 2013, together with the requested briefing schedule under which Miles's reply to the State's answer was filed October 21, 2013.

As will be made clear, *infra*, the safety of the State exception is immaterial to our decision.

including murder, that did not impact State security, and that the proscription operated without regard to the method of executing the sentence. This absolutist position is essential to Miles's hypothesis because Maryland's modern death penalty statute, if applied to Miles, does not infringe constitutional prohibitions against cruel or unusual punishment or against cruel and unusual pains and penalties. *See, e.g., Johnson v. State,* 303 Md. 487, 542, 495 A.2d 1, 29 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986); *Stebbing v. State,* 299 Md. 331, 373, 473 A.2d 903, 924, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); *Colvin v. State,* 299 Md. 88, 126–27, 472 A.2d 953, 972, *cert. denied,* 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984); *Calhoun v. State,* 297 Md. 563, 606, 468 A.2d 45, 65 (1983) (holding that modern death penalty statute satisfies Eighth and Fourteenth Amendments to the United States Constitution and MDR Articles 16 and 25), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Johnson v. State,* 292 Md. 405, 436, 439 A.2d 542, 559–60 (1982); *Tichnell v. State,* 287 Md. 695, 729, 415 A.2d 830, 848 (1980) (finding that modern death penalty statute satisfied Eighth and Fourteenth Amendments to the United States Constitution and MDR Article 25 but remanding for re-sentencing because death sentence had been applied arbitrarily).

The thesis advanced by Miles begins with an intellectually influential work by Cesare Beccaria (1738–1794), *An Essay on Crimes and Punishments,* written in Italian in 1764 and first published in English in 1767 (Beccaria).[5] *See also* XI W. Holdsworth, *A History of English Law,* at 575, notes 11 & 12 (1938) (Holdsworth). Beccaria advocated proportionality in sentencing. Beccaria at 21–26. He opposed capital punishment and proposed lifelong slavery as the alternative punishment for murder. *Id.* at 102–17. Because of the possibility that a revolutionary might escape, he believed that capital

---

**5.** Our references to Beccaria are to the Legal Classics Library Edition published by Gryphon (1991).

punishment was justified only to protect the safety of the state. *Id.* at 103–04.

The term "sanguinary" does not appear in the English translation of Beccaria's work. The Legal Classics English edition includes an unsigned commentary, usually attributed to Voltaire, that uses the term "sanguinary" in the title of chapter thirteen, which describes the death sentence imposed on a poor French man for breaking his Lenten fast by eating "a morsel of horse-flesh," out of "the most intolerable hunger." Commentary at 43. The point of the commentary is the shocking lack of proportionality in that case.

Miles, acknowledging computer searches for his ability to survey the subject, has presented us with an array of quotations using the term "sanguinary" in historical, political, philosophical, legal, and other writings, particularly from the eighteenth and nineteenth centuries. For example, we are referred to eleven writers of those centuries who, as Miles synthesizes their quotations, "say that Solon abolished the sanguinary laws of Draco, except the ones for murder, thereby implying that the death penalty for murder is a sanguinary law." Brief of Appellant at 16 n. 4.[6]

Miles also directs our attention to the use of "sanguinary" by those who opposed capital punishment under any circumstances. The Maine Constitution, Article I, § 9 (1820), provided: "Sanguinary laws shall not be passed; all penalties and punishments shall be proportioned to the offense . . . nor cruel nor unusual punishments inflicted." In 1836 a Joint Select Committee on Capital Punishment considered this provision and reported, in relevant part:

---

**6.** When presented syllogistically, the argument is illogical.
   The laws of Draco were sanguinary.
   Capital punishment for Murder was a law of Draco.
   Therefore, capital punishment for murder is sanguinary.
I.M. Copi, *Introduction to Logic*, at 119 (7th ed. 1986), calls the logical error the Fallacy of Division, Type 2. That which is true collectively is not necessarily true distributively.

"*Sanguinary* is derived from a Latin word which signifies blood, and is synonymous with the Latin *sanguinarius* and the French *sanguinaire,* both of which signify bloody, murderous, cruel. These are the definitions given by Webster, and other lexicographers; and it is in this sense that it is here used. If an objection be raised to this construction, on the ground that the law requiring the punishment of death by hanging, for certain offences, is not one requiring the blood of a fellow-being, it will be readily perceived that such an objection is unwarranted by the common use of language. If one man shall put to death another, whether by poisoning, strangulation, or suffocation, he is said to be guilty of the blood of the murdered person, and is even said to have shed his blood, although no blood has literally been spilt. It is in this sense that the advocates of the punishment of death explain and make the practical application of the passage of Scripture, 'Whoso sheddeth man's blood, by man shall his blood be shed.' Hence, they say, the man who has shed the blood of another should be hung upon the gallows; that is, his blood should be shed to expiate the crime. It is obviously true that the taking of life and the shedding of blood are used synonymously. In this sense, hanging a man with a halter till he is dead is as much a sanguinary punishment as decapitation. The law, therefore, prescribing this mode of punishment is a sanguinary law, and consequently unconstitutional."

T. Purrington, *Report of Capital Punishment, Made to the Maine Legislature in 1836,* at 28–29 (2d ed. 1852). Maine abolished the death penalty in 1876, reinstated it for murder in 1883 and permanently abolished it in 1887. *See* D.W. Denno, *Getting to Death, Are Executions Constitutional?,* 82 Iowa L.Rev. 319, 448 n. 824 (Jan. 1997).

With respect to "ought" in the sanguinary laws clause, Miles asserts that it is mandatory, and not directory. Significantly, Miles recognizes that the clause is a " 'restriction' and 'limitation' on the power of the General Assembly." Appellant's Brief and Appendix at 8 (quoting *Harford County v. Board of Supervisors of Elections,* 272 Md. 33, 39–40, 321 A.2d 151,

154–55 (1974)). Citing to Samuel Johnson's 1775 dictionary and to Black's Law Dictionary 136 (6th ed. 1990) for the meaning of "to avoid," Miles observes that the seventh meaning assigned by the former, and a meaning included by the latter, is "to annul." He concludes that, in the sanguinary laws clause, it

"could mean either 'to be refrained from' or 'to be made void.' If it means the former, the clause would prohibit the legislature from enact[ing] 'sanguinary Laws' to the extent that such a prohibition was 'consistent with the safety of the State.' If the latter, the clause would require that 'sanguinary Laws' be voided 'as far as it is consistent with the safety of the State.' Under either interpretation, the result is the same."

Appellant's Brief and Appendix at 8–9.

*The Circuit Court's Decision and The State's Submission*

In a thirty-nine page opinion, the learned circuit court undertook to define a sanguinary law. Addressing the plain meaning of the text of 1776 MDR Article 14, it reviewed the dictionaries of the era.

"The many founding-era dictionaries consulted by the Court do not directly define the phrase 'sanguinary laws.' The dictionaries of the time, however, consistently define the word 'sanguinary' as 'cruel; bloody; murderous.' SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: ABSTRACTED FROM THE FOLIO EDITION (1768); SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: IN WHICH THE WORDS ARE DEDUCED FROM THEIR ORIGINALS (1799); WILLIAM KENDRICK, A NEW DICTIONARY OF THE ENGLISH LANGUAGE (1773); JOHN WALKER, A DICTIONARY OF THE ENGLISH LANGUAGE (1775); NATHAN BAILEY, A UNIVERSAL ETYMOLOGICAL ENGLISH DICTIONARY (1794); THOMAS SHERIDAN, A COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1796); NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806). The word 'sanguinary' is, indeed, rooted in the Latin word 'sanguis,' meaning 'blood.' D.P. SIMPSON, CASSELL'S LATIN DICTIONARY ( [Funk] & Wagnalls 1977) (1959).

"It is instructive to further define the words that comprise the definition of 'sanguinary.' The word 'cruel,' was defined by founding-era dictionaries as '[p]leased with hurting others; inhuman, hard-hearted; barbarous.' SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: ABSTRACTED FROM THE FOLIO EDITION (1768); NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806) ('hardhearted, inhuman, bloody, fierce'). The term 'blood,' in turn, means 'stained with blood, murderous, cruel.' NOAH WEBSTER, A COMPENDIOUS DICTIONARY OF THE ENGLISH LANGUAGE (1806); SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: IN WHICH THE WORDS ARE DEDUCED FROM THEIR ORIGINALS (1799) ('cruel; murderous: applied either to men or facts'). 'Inhuman' was defined as '[b]arbarous; savage; cruel; uncompassionate.' SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: IN WHICH THE WORDS ARE DEDUCED FROM THEIR ORIGINALS (1799). Similarly, 'barbarous' had a meaning of '[c]ruel; inhuman' and '[s]tranger to civility; savage; uncivilized.' SAMUEL JOHNSON, A DICTIONARY OF THE ENGLISH LANGUAGE: ABSTRACTED FROM THE FOLIO EDITION (1768). Finally, 'murderous' was defined as '[b]loody, guilty of murder.' RICHARD COXE, WALKER'S DICTIONARY, A CRITICAL PRONOUNCING DICTIONARY OF THE ENGLISH LANGUAGE (1813)."

The court reviewed the historical context of the sanguinary laws clause from *"The Bloody Code of England"* through the *"Harsh Laws in Colonial Maryland,"* to *"The Age of Enlightment."* It concluded:

"The overwhelming weight of evidence reveals that 'sanguinary laws' are laws which impose severe, inhumane, barbarous, cruel, and grossly disproportionate punishment. Sanguinary laws are reminiscent of the extreme punishments instituted by the Bloody Code of England. Through the Sanguinary Laws Clause, Maryland's founding fathers rejected the harsh punishments characteristic of the Bloody Code and declared that criminal sanctions shall be both humane and proportioned to the offence. The Sanguinary Laws Clause was a mandate to reform the criminal law by

bringing punishments in line with Enlightment-era principles.

"Defendant's assertion that the phrase 'sanguinary laws' means laws that authorize the death penalty is neither consistent with the common usage of the phrase, nor with the historical context of Article 16. Certainly, if a statute made theft a capital crime, that law would be sanguinary. Common founding-era usage of the term 'sanguinary law,' however, would not encompass imposition of the death penalty for the most serious and heinous crimes, such as first degree murder. This interpretation is consistent with history. Despite the reforms to criminal laws that followed the founding of the states whose constitutions limit 'sanguinary laws,' the death penalty was never abolished for first degree murder and other serious offenses."

The State agrees with the circuit court's analysis, but it also points out that it is unnecessary to the decision of this case to define sanguinary laws for all purposes. It is sufficient to decide whether capital punishment for murder, carried out by lethal injection, is prohibited by current MDR Article 16.

### Rules of Construction

In general, the same rules that apply to statutory construction apply to the construction of constitutional provisions. *See, e.g., Davis v. Slater,* 383 Md. 599, 604, 861 A.2d 78, 80 (2004). We look first to the plain meaning of the provision, in the context of the instrument as a whole. *See Barbre v. Pope,* 402 Md. 157, 172, 935 A.2d 699, 708 (2007). If the meaning remains ambiguous, we consult the history of the enactment or adoption, which we may consult in any event as a check or verification on the apparent plain meaning. *See Robey v. State,* 397 Md. 449, 454, 918 A.2d 499, 502 (2007).

In construing constitutional provisions,

"It is not until the means of solution afforded by the entire Constitution have been exhausted without success that the Court is justified in calling outside facts or considerations to its aid. When that becomes necessary, however, it is permissible to inquire into the prior state of the law, the

previous and contemporary history of the people, the circumstances attending the adoption of the organic law, as well as broad considerations of expediency. The object is to ascertain the reason which induced the framers to enact the provision in dispute and the purpose sought to be accomplished thereby, in order to construe the whole instrument in such way as to effect that purpose. The Court may avail itself of any light that may be derived from such sources, but it is not bound to adopt it as the sole ground of its decision."

*Reed v. McKeldin,* 207 Md. 553, 561, 115 A.2d 281, 287 (1955).

### Ambiguity

Here, as the arguments of, and the authorities cited by, the parties make plain, "sanguinary Laws" is an ambiguous phrase. Further, "ought to be avoided" is an ambiguous phrase.

Miles submits that, when used in the MDR, and in current Article 16 in particular, "ought" means "shall." He claims that the word's appearance in a constitutional provision must mean that the provision is mandatory, not simply directory. Such a sweeping generalization is, however, inaccurate. The word "ought" appears in twenty-eight of the forty-seven articles of the current MDR, almost all of which originated in the 1776 MDR. Examination of those provisions reveals a full spectrum of meanings depending on context, ranging in character from a mere statement of policy to an imperative command.

In some instances, the word "ought" conveys nothing more than a statement of public policy in the most general of terms. *See* MDR Article 43 ("That the Legislature ought to encourage the diffusion of knowledge and virtue, the extension of a judicious system of general education, the promotion of literature, the arts, sciences, agriculture, commerce and manufactures, and the general melioration of the condition of the People.").[7]

---

7. The second sentence of Article 43 ("The Legislature may provide that land actively devoted to farm or agricultural use shall be assessed on

In other instances, the word "ought" may reasonably be interpreted as conveying a prohibition upon the Executive, General Assembly or Judiciary. *See, e.g.,* Article 17 ("no *ex post facto* Law ought to be made; nor any retrospective oath or restriction be imposed, or required"); [8] Article 18 ("That no Law to attaint particular persons of treason or felony, ought to be made in any case, or at any time, hereafter."); Article 22 ("That no man ought to be compelled to give evidence against himself in a criminal case."); Article 24 ("That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."); Article 25 ("That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted, by the Courts of Law."); Article 26 ("all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted"); Article 36 ("no person ought by any law to be molested in his person or estate, on account of his religious persuasion, or profession, or for his religious practice ... nor ought any person to be compelled to frequent, or maintain, or contribute, unless on contract, to maintain, any place of worship, or any ministry"); Article 40 ("That the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege.").[9]

---

the basis of such use and shall not be assessed as if sub-divided.") is of more recent vintage. *See* Chapter 65 of the Acts of 1960. The first sentence dates, without change, to Article 41 of the 1851 MDR. *See* Friedman–Temple at 673.

8.  The phrase "nor any retrospective oath, or restriction be imposed, or required" dates only to the 1867 MDR; the rest of this article is original to the 1776 MDR. *See* Friedman–Temple at 656.

9.  The provision of Article 40 guaranteeing freedom of the press is original to the 1776 MDR, but freedom of speech was not added until the 1864 MDR. *See* Friedman–Temple at 672.

It is no coincidence that many of these provisions, specifically Articles 17, 22, 24, 25, 26, and 40, have been read either *in pari materia* with corresponding, mandatory, provisions in the United States Constitution, or as guaranteeing even greater protection.

Miles's request that the Court read "ought" as the equivalent of "shall" ignores the fact that several provisions of the 1776 MDR that employed "ought" were later changed to "shall," suggesting that "ought" is more directory than mandatory. *See* Article 27 ("That no conviction shall work corruption of blood or forfeiture of estate.");[10] Article 31 ("That no soldier shall, in time of peace, be quartered in any house, without the consent of the owner, nor in time of war, except in the manner prescribed by Law.");[11] Article 33 ("the Judges shall not be removed, except in the manner, and for the causes provided in this Constitution. No Judge shall hold any other office, civil or military, or political trust, or employment of any kind, whatsoever, under the Constitution or Laws of this State, or of the United States, or any of them");[12] Article 35 ("That no person shall hold, at the same time, more than one office of profit, created by the Constitution or Laws of this State; nor shall any person in public trust receive any present from any foreign Prince or State, or from the United States, or any of them, without the approbation of this State.").[13]

---

**10.** The version of Article 27 that appeared in 1776 MDR, then Article 24, used the word "ought": "That there ought to be no forfeiture of any part of the estate of any person for any crime except murder, or treason against the State, and then only on conviction and attainder." "Ought" was replaced by "shall" in the 1851 MDR. *See* Friedman–Temple at 661.

**11.** The word "ought" appeared in 1776 MDR, then Article 28. It was replaced by "shall" in the 1864 MDR. *See* Friedman–Temple at 662.

**12.** All instances of the word "shall" in the present Article 33 date to 1851 MDR, then Article 30; the 1776 MDR had employed "ought." *See* Friedman–Temple at 663.

**13.** "Ought" was replaced by "shall" in the 1867 MDR. *See* Friedman–Temple at 665.

Indeed, at least one of the "shall" provisions has been interpreted as being not only not mandatory, but of very limited effect, specifically, Article 23's provision that "the Jury shall be the Judges of Law." *See Unger v. State,* 427 Md. 383, 48 A.3d 242 (2012); *Montgomery v. State,* 292 Md. 84, 437 A.2d 654 (1981); *Stevenson v. State,* 289 Md. 167, 423 A.2d 558 (1980).

It is against this spectrum of meaning that the Court is asked to determine the meaning of "ought to be avoided" in 1776 MDR Article 14. Samuel Johnson gave three alternative definitions of the verb "ought": 1) the preterite of the verb "owe," *i.e.,* "Owed; was bound to pay; have been indebted"; 2) "To be obliged by duty"; or 3) "To be fit; to be necessary." S. Johnson, *A Dictionary of the English Language,* at 1428 (1755). The same definitions appear in Johnson's 1768 revised third edition. Usage examples from Johnson's 1755 edition suggest that the second definition carried more of an aspirational tone (Bacon: "Judges *ought* to remember, that their office is to interpret law, and not to make or give law"; Pope: "Morals criticks *ought* to show"; Pope: "She acts just as she *ought,* But never, never reach'd one generous thought"), whereas the third definition had a somewhat stronger meaning (Locke: "If grammar *ought* to be taught, it must be to one that can speak the language already"). The accepted meaning of "ought" may have shifted over the centuries. In more modern usage, the auxiliary verb "ought" is "used to express moral obligation, duty, or necessity . . . or what is correct, advisable, or expedient . . . or what is naturally expected or logically sound." *Webster's Third New International Dictionary* (unabridged), at 1599 (1961, 1976 ed.). In modern legal usage, "*Ought* should be reserved for expressions of necessity, duty, or obligation; *should,* the weaker word, expresses mere appropriateness, suitability, or fittingness." B.A. Garner, *A Dictionary of Modern Legal Usage,* at 396 (1987).

Furthermore, in the sanguinary Laws clause the auxiliary verb "ought" is paired with the main verb "avoid." This is the only appearance of the word "avoid" in the MDR. Johnson gives four definitions for the verb "to avoid": 1) "To shun; to

escape"; 2) "To endeavour to shun"; 3) "To evacuate; to quit"; 4) "To oppose; to hinder effect." S. Johnson, *A Dictionary of the English Language,* at 184 (1755). Modern definitions are similar. In Webster's unabridged Third Edition, after obsolete, archaic and legal ("to make void: annul, vacate, defeat, evade, invalidate") definitions, the fourth definition reads: "a) to keep away from: stay clear of ... b) to prevent the occurrence or effectiveness of ... refrain from." *Webster's Third New International Dictionary* (unabridged), at 151 (1961, 1976 ed.).

### Non-retroactivity of MDR Article 16

In any event, there is no indication that Article 16 was intended to change pre-existing law. The only MDR provision explicitly referring to pre-existing law is Article 5(a)(1), which adopts the common law and statutes of England. Nothing in Article 5(a)(1) purports to change existing law in a self-executing manner. *Compare* Article 5(c), proposed by 1992 Md. Laws 203, 204 ("That *notwithstanding the Common Law of England,* nothing in this Constitution prohibits trial by jury of less than 12 jurors in any civil proceeding in which the right to a jury trial is preserved.") (emphasis added). Friedman–Temple at 686 n. 166.

Article 16 itself contains no explicit directive that it should be applied retrospectively. On the contrary, the second clause of Article 16 provides: "and no Law to inflict cruel and unusual pains and penalties *ought to be made in any case, or at any time, hereafter.*" (Emphasis added). Although the second clause of Article 16 does not necessarily control the sanguinary Laws clause, there is nothing in the sanguinary Laws clause suggesting it should be treated any differently.

Determining the intent of the sanguinary Laws clause takes us back to the 1776 Constitutional Convention. There is no record of the debates of that Convention.[14] Scholars, however,

---

14. For a record of the proceedings of the Convention, *see The Decisive Blow is Struck: A facsimile edition of The Proceedings of the Constitutional Convention of 1776 and the First Maryland Constitution* (1977).

have determined that there were two drafts of the 1776 MDR, the first of August 27, 1776, and the second of September 17, 1776. The MDR was adopted by the convention on November 3, 1776. *See* Friedman–Temple at 647. *See also* D. Friedman, *Tracing the Lineage: Textual and Conceptual Similarities in the Revolutionary–Era State Declarations of Rights of Virginia, Maryland, and Delaware,* 33 Rutgers L.J. 929, 941 and n. 47 (2002) (Friedman–Rutgers).

## DISCUSSION

I. **Death was the common law penalty for murder. The penalty was not abrogated by 1776 MDR Article 14, which applies only to future legislation.**

### *Overview of Analysis I*

■ 1776 MDR Article 14 was a non-retroactive limitation on then *future* legislation by the General Assembly. It had no effect on the imposition by the judiciary of the penalty of death by hanging for murder that had been in force in the Province of Maryland by the common law of England and that constitutionally became the law of the revolutionary State of Maryland by 1776 MDR Article 3 (now, as amended, Article 5). Murder remains a common law crime in Maryland and, until October 1, 2013, the possible penalty for certain murders continued to be death. Statutory enactments subsequent to 1776 reduced the crimes and the types of murders qualifying for the death penalty and made changes in the method of execution that were intended to make capital punishment more humane. Miles does not contend that, if capital punishment for murder is not a sanguinary law, per se, death by lethal injection makes it sanguinary.

### *Pre–Revolutionary Criminal Punishments*

At the time of the 1776 Maryland Constitutional Convention, the law of the newly independent state, including the law of crimes and punishments, consisted of the common law of England, an uncertain number of British statutes, and acts of

the provincial assembly, that might or might not have been repealed by implication.

XI Holdsworth at 556 substantially agrees with Blackstone's description of eighteenth century English criminal punishments. The latter said at IV Blackstone, *Commentaries on the Laws of England,* at 376–77 (1765), as quoted by Holdsworth:

" 'Some punishments are capital, which extend to the life of the offender, and consist generally in being hanged by the neck till dead; though in very atrocious crimes other circumstances of terror, pain, or disgrace are superadded, as in treasons of all kinds, being drawn or dragged to the place of execution; in high treason affecting the King's person or government, emboweling alive, beheading, and quartering; and in murder a public dissection. And, in case of any treason committed by a female, the judgment is to be burned alive.... Some punishments consist in exile or banishment, by abjuration of the realm, or transportation: others in loss of liberty, by perpetual or temporary imprisonment. Some extend to confiscation, by forfeiture of lands or movables, or both, or of the profits of lands for life: others induce a disability of holding offices or employments, being heirs, executors, and the like. Some, though rarely, occasion a mutilation or dismembering, by cutting off the hand or ears: others fix a lasting stigma on the offender, by slitting the nostrils, or branding in the hand or cheek. Some are merely pecuniary, by stated or discretionary fines; and lastly there are others, that consist principally in their ignominy, though most of them are mixed with some degree of corporal pain; and these are inflicted chiefly for such crimes, as either arise from indigence, or render even opulence disgraceful. Such as whipping, hard labour in the house of correction or otherwise, the pillory, the stocks, and the ducking stool.' "

Criminal punishments enacted by the provincial assembly during and after 1715 are summarized in N. Mereness, *Maryland as a Proprietary Province,* at 277–78 n. 1 (The MacMillan Co., New York, 1901):

"The penalties that were imposed by acts of the Maryland Assembly, during or after the year 1715, were, principally, the following: a person convicted of embezzling, impairing, razing, or altering any will or record within the province, whereby the estate or inheritance or freehold of any person should be defeated, injured, or in any ways altered, was to forfeit all his goods, chattels, lands, and tenements, be set in the pillory for two hours, and have both his ears nailed thereto and cut from off his head; a person convicted of stealing that which was valued at less than one thousand pounds of tobacco was to pay fourfold, be put in the pillory, and given not to exceed forty lashes; a person convicted of fornication was to be fined 30s. or six hundred pounds of tobacco; a person convicted of adultery was to be fined £3 or twelve hundred pounds of tobacco; a person convicted of wilfully burning a courthouse was to suffer death without benefit of clergy; a person convicted of blasphemy was for the first offence to be bored through the tongue and fined £20 sterling, or, if unable to pay the fine, be imprisoned for six months; for the second offence, to be stigmatized by burning in the forehead with the letter B and fined £40, or, if unable to pay the fine, be imprisoned for one year; and for the third offence to suffer death without benefit of clergy; a person found guilty of profane swearing was to be fined 2s. 6d. for the first offence and 5s. for every offence after the first; a drunkard was to be fined 5s. for every offence of drunkenness—if the swearer or drunkard was unable to pay the fine, he was to be put in the stocks or given not to exceed thirty-nine lashes; a person convicted of breaking the Sabbath was to be fined two hundred pounds of tobacco; a negro or other slave convicted of petit treason, or murder, or wilfully burning a house, might be sentenced to have his right hand cut off, hanged, head severed from the body, body divided into four quarters and set up in the most public places of the county where the act was committed; a person convicted of breaking into a shop, storehouse, or warehouse, and stealing from thence any goods to the value of 5s., was to suffer death as a felon without benefit of

clergy; a person convicted of cutting or destroying tobacco or exciting others to do so was to be fined £100 sterling and be imprisoned for six months; a person convicted of wilfully burning another's tobacco, or of aiding or abetting in such an offence, was to suffer death as a felon without benefit of clergy; a slave convicted of insurrection, murder, poison, rape of white women, or burning houses, was to suffer death as a felon without benefit of clergy."

With respect to murder and the other common law felonies, XI Holdsworth at 557 traces the penalty of death by hanging to the judges of the thirteenth century. ("The punishment of death by hanging for all felonies was due to the judicial practice of the thirteenth century.").

Coke similarly attributed to the common law, as distinguished from statute, death by hanging as the ordinary penalty for murder. In 3 Edward Coke, *Institutes of the Law of England* (1797), Coke states at 48:

"This offence [poisoning] was so odious, that by act of parliament [22 Henry VIII, c. 9 (1530) ], it was made high treason, and inflicted a more grievous and lingering death then [sic] the common law prescribeth, viz. That the offender should be boyled [sic] to death in hot water[.]"

Further, Coke explained at 210:

"Of judgements, some be by the common law, and some by statute law, and some by custome [sic].

"Of judgements by the common law, some be in criminall [sic] causes, or pleas of the crown, concerning the life of man (whereof we are principally to intreat,) and of these some be expressed, and some implied.

. . . .

"All pleas of the crown, concerning the life of a man, are divided into treason and felony.... [I]n all the severall [sic] cases of felony, though some be more hainous [sic] then [sic] other, yet all being but felony, one and the same judgement is given."

We need not sort through the inventory of eighteenth century punishments and distinguish those which the framers of 1776 MDR Article 14 considered to be sanguinary from those that were not. It is sufficient for present purposes to note that, under the common law of England and of the Maryland province, death by hanging was the penalty for the common law offense of murder.

### The 1776 Convention

There were five provisions before the 1776 Constitutional Convention that are relevant to the "sanguinary Laws" issue in this case. The governing law for the self-declared sovereignty, or at least the standard for determining governing law, was answered by 1776 MDR Article 3. It read:

"3. That the inhabitants of Maryland are entitled to the common law of England, and the trial by jury, according to the course of that law, and to the benefit of such of the English statutes, as existed at the time of their first emigration, and which by experience have been found applicable to their local and other circumstances, and of such others as have been since made in England, or Great Britain, and have been introduced, used, and practised, by the courts of law or equity; and also to all acts of assembly in force on the first of June seventeen hundred and seventy four, except such as may have since expired, or have been, or may be altered by acts of Convention, or this Declaration of Rights, subject nevertheless to the revision of, and amendment or repeal by, the legislature of this state; and the inhabitants of Maryland are also entitled to all property derived to them from or under the charter granted by his majesty Charles the first to Caecilius Calvert baron of Baltimore."

F. Green, *A Declaration of Rights, and the Constitution and Form of Government, Agreed to by the Delegates of Maryland, in Free and Full Convention Assembled,* at 6 (1776) (available from the Maryland State Archives, MSA SC M

3145, at 221, et seq., http://aomol.net/megafile/msa/speccol/sc 4800/sc4872/003145/html/m3145–0221.html).[15]

In *State v. Buchanan,* 5 H. & J. 317, 1821 WL 482 (Md. 1821), one issue was whether common law conspiracy was a crime in Maryland or whether the common law principles for determining proscribed conspiracies had been limited by 33 Edw. I, c. 2 (1304), so that the indictment against Buchanan did not charge a crime. Overruling dismissal of the charges by the trial court, this Court said:

"If there had never been in Maryland, since the original settlement of the colony by our ancestors, a prosecution for murder, arson, assault and battery, libel, with many other common law offences, and consequently no judicial adoption of either of those branches of the common law, could it therefore be contended, that there was now no law in the State for the punishment of such offences? The third section of the Bill of Rights ... has no reference to adjudications in England anterior to the colonization, or to judicial adoptions here, of any part of the common law, during the continuance of the colonial government, but to the common law in mass, as it existed here, either potentially, or practically, and as it prevailed in England at the time, except such portions of it as are inconsistent with the spirit of that instrument, and the nature of our new political institutions."

5 H. & J. at 358.

Two separate articles of the 1776 MDR, as adopted, address cruel and/or unusual pains, penalties or punishments. In the August 27th draft, the sanguinary laws clause was contained in Article 12. Article 14 of that draft provided that "no law to inflict unusual pains and penalties, unknown to the common law, ought to be made in any case, or at any time hereafter." F. Green, *The Declaration and Charter of Rights* (available at

---

**15.** "When royal Governor Robert Eden sailed for a visit to England on May 28, 1774, proprietary control of Maryland effectively ended. In Eden's absence, Maryland was governed by an unofficial government by convention." D. Friedman, *The Maryland State Constitution,* at 4 (2011).

MSA SC M 3145, at 1960, http://aomol.net/megafile/msa/speccol/sc4800/sc4872/003145/html/m3145-1960.html). The two clauses were combined in the September 17th draft, and adopted, as Article 14. *See* Friedman–Temple at 656 and included notes. The two clauses of Article 14 speak of laws that "ought to be avoided" and "ought [not] to be made."

The other article of the 1776 MDR that dealt with cruel or unusual punishments is Article 22. It read:

> "22. That excessive bail ought not to be required, nor excessive fines imposed, nor cruel or unusual punishments inflicted by the court of law."

F. Green, *A Declaration of Rights, and the Constitution and Form of Government, Agreed to by the Delegates of Maryland, in Free and Full Convention Assembled,* at 9 (1776) (available at MSA SC M 3145, at 221, *et seq.,* http://aomol.net/megafile/msa/speccol/sc4800/sc4872/003145/html/m3145-0221.html).

The plain language of these two Articles informs us that Article 14 was a restriction on legislative action while Article 22 was a restriction on judicial action. That Article 14 was intended to be independent of Article 22 was confirmed by the proceedings of the 1864 Maryland Constitutional Convention. Discussing Article 14, Friedman condenses what happened.

> "The independent content of this provision [Article 14] was suggested at the 1864 Maryland Constitutional Convention. Delegate Henry Stockbridge, Sr. of Baltimore City argued that this article, and the 'cruel or unusual punishments' article [Article 22], embraced the same topic and ought to be combined. Delegate Oliver Miller of Anne Arundel County (later a Judge of the Court of Appeals of Maryland (1867–1892)) persuaded the convention that the provisions were different in that this article is directed to the legislature in adopting penalties, while the other is directed exclusively to the judiciary in imposing sentences. This view is reinforced by the fact that between the August 27, 1776 draft and the September 17, 1776 draft, Article 22

was changed to emphasize the fact that that article was directed specifically to the judiciary."

Friedman–Rutgers at 1018–19. The change referred to was the addition in Article 22 of the phrase, "by the court of law." [16]

The fourth and fifth provisions before the 1776 Convention that are relevant to the sanguinary laws issue before us will be considered in Part II.

Because death by hanging was the penalty for murder at common law and because death was and, until Chapter 156 of the Acts of 2013, remained, a possible penalty for certain murders, legislation subsequent to 1776 did not make or create death as the penalty for murder. Consequently, adoption of the sanguinary laws clause did not eradicate capital punishment for murder because that clause applied only prospectively, to legislation "to be avoided."

### The Act of 1809 and Maryland Cases

By Chapter 138 of the Acts of 1809, the General Assembly addressed crimes and punishments. The enactment's preamble recited:

"WHEREAS it frequently happens, that men resigning themselves to the dominion of inordinate passion, commit great violations upon the lives, liberties or property, of others, which it is the great business of the laws to protect

---

**16.** Friedman's discussion of the sanguinary laws clause continues beyond the above-quoted paragraph. He writes:

"Independent content may also be given to this provision by reference to the Pennsylvania Constitution of 1776, drafted days prior in Philadelphia. The Pennsylvania Constitution used the word 'sanguinary' twice. In both instances, the Pennsylvania framers used the word to describe punishments that were *unnecessary* or *disproportionate* to the offenses committed. Professor A.E. Dick Howard has traced this provision, and those like it in other state constitutions, to Chapter 20 of the *Magna Carta*, which requires punishments to be proportionate to the crimes. If true, the origins of this provision are distinct from the origins of provisions prohibiting 'cruel' and/or 'unusual punishments.' "

Friedman–Rutgers at 1019 (footnotes omitted).

and secure, and experience evinces that the surest way of preventing the perpetration of crimes, and of reforming offenders, is by a mild and justly proportioned scale of punishments[.]"

As to murder, sections III and IV of Chapter 138 provided, in part:

"AND, whereas the several offences which are included under the general denomination of murder, differ so greatly from each other in the degree of their atrociousness, that it is unjust to involve them in the same punishment, therefore, BE IT ENACTED, That all murder which shall be perpetrated by means of poison, or by lying in wait, or by any kind of wilful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempt to perpetrate, any arson, or to burn any barn, tobacco-house, stable, warehouse, or other out-house, not parcel of any dwelling-house, having therein any tobacco, grain, hay, horses, cattle, or goods, wares and merchandise, rape, sodomy, mayhem, robbery or burglary, shall be deemed murder of the first degree; and all other kind of murder shall be deemed murder of the second degree[.]

. . . .

"... Every person convicted of murder of the first degree, his or her aiders, abettors and counsellors, shall suffer death, by hanging by the neck."

It is well settled that Chapter 138 did not enact a new, statutory crime, for which capital punishment was created as the penalty. Rather, by dividing murder into degrees, the enactment reduced the types of murders (not to mention other felonies) for which capital punishment was prescribed or discretionarily available. The death penalty remained unchanged for those murders that were found to be in the first degree.

*Davis v. State,* 39 Md. 355, 1874 WL 4723 (1874), has been repeatedly cited by this Court for the proposition that the statutory division of common law murder into degrees simply graduated the penalty. Davis was convicted of a murder that was found to be in the first degree. On writ of error, he

argued that the indictment failed to allege the circumstances required by Chapter 138 to establish first degree murder. This Court rejected that contention. After quoting the preamble and enacting language of Chapter 138, our predecessors said:

> " 'Murder' is here recognized as a general denomination, including offenses differing from each other in their degrees of atrocity, but not in their nature or kind; no attempt is made to explain or modify its meaning or abridge its range. Its common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed."

*Id.* at 374.

The appellant in *Stansbury v. State*, 218 Md. 255, 146 A.2d 17 (1958), was sentenced to death for felony murder, arising out of a robbery, as was Miles. He argued that the evidence failed to prove premeditation. Referring to the then form of the first degree statute, Maryland Code (1957), Article 27, § 407, this Court said:

> "We have held that the quoted sections do not create any new crime, but merely classify murder, as it was known at common law, into degrees. *Wood v. State*, 191 Md. 658, 666, 62 A.2d 576 [580 (1948) ]; *Abbott v. State*, 188 Md. 310, 312, 52 A.2d 489 [490 (1947) ]. At common law, a killing in the perpetration of a robbery was murder, regardless of intent. See Clark and Marshall, *Crimes* (4th ed.), sec. 245. As used in the statute, the 'common law sense is left unimpaired; the measure of punishment only is sought to be graduated according to the circumstances under which it was committed.' *Davis v. State, supra.* It is perfectly clear that a finding either that the killing was wilful, deliberate and premeditated, or that it was in perpetration of a robbery, would support a verdict of first degree murder."

*Id.* at 260, 146 A.2d at 20.

To the same effect, *see Jackson v. State*, 286 Md. 430, 435–36, 408 A.2d 711, 715 (1979); *Gladden v. State*, 273 Md. 383, 389–90, 330 A.2d 176, 180 (1974); *Brooks v. State*, 104 Md.App.

203, 216–17, 655 A.2d 1311, 1317 (1995); *McDowell v. State*, 31 Md.App. 652, 657, 358 A.2d 624, 627 (1976); *Warren v. State*, 29 Md.App. 560, 565–66, 350 A.2d 173, 177–78 (1976).

The protection to the people under the 1776 MDR from the *enforcement* of cruel or unusual punishments under laws *existing* at the time of Independence lay in the restriction on the courts in Article 22, prohibiting the infliction of "cruel or unusual punishments," and in Article 3, expressly qualifying the incorporation of British and provincial assembly statutes. We have seen that the death penalty for murder, administered by lethal injection, is not a cruel or unusual punishment. In the area of crimes and punishments, the former Article 3 (now Article 5(a)(1)) protection required adjudication, but the need for adjudication was greatly reduced by Chapter 138 of the Acts of 1809.

Miles argues that "sanguinary Laws" cannot mean "laws that impose severe, barbarous, cruel and grossly disproportionate punishment," as the circuit court concluded, because that reading of the sanguinary laws clause in 1776 MDR Article 14 renders as surplusage the "cruel and unusual pains and penalties clause." We recognize that imposition of the death penalty for crimes that are not comparable to murder or treason may, depending on the circumstances, raise substantial questions of cruel and unusual punishment. We further recognize that some of the methods of executing capital punishment that were permitted as of 1776 and that, at times, had been carried out, particularly in England, would constitute cruel and unusual punishment. It is a question of proportionality. But, even if the sanguinary laws and cruel and unusual punishments clauses overlapped, there would be no surplusage because the two clauses serve different purposes. Rephrased to an affirmative statement, the sanguinary laws clause, standing alone, authorized the General Assembly prospectively to enact sanguinary laws when "consistent with the safety of the State." Standing alone, that clause left Article 14 with only a negative implication as protection from future laws that might authorize "cruel and unusual pains and penalties." Conse-

quently, it would seem to have been necessary, or at least desirable, to affix the "cruel and unusual" clause to Article 14.

## II. The framers did not intend death as the penalty for murder to be included in sanguinary laws.

■ Even if the sanguinary laws clause had been intended to operate retroactively, the words "sanguinary laws" were not intended to include death by hanging as the penalty for murder. Otherwise, there would be irreconcilable conflicts.

### The Text

The August 27, 1776 draft of MDR Article 19 read:

"19. That in all *capital* or criminal prosecutions, every man hath a right to be informed of the accusation against him, to be allowed counsel, to be confronted with the accusers, or witnesses, to examine evidence on oath in his favour, and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."

F. Green, *The Declaration and Charter of Rights* (available at MSA SC M 3145, at 1960, http://aomol.net/megafile/msa/speccol/sc4800/sc4872/003145/html/m3145–1960.html) (emphasis added). *See also* Friedman–Temple at 658. If Miles's construction of "sanguinary" is correct, then the express inclusion of capital cases was a colossal drafting error by the drafting committee for the Bill of Rights and Form of Government at the 1776 Convention. But, the committee's members were Samuel Chase, William Paca, Matthew Tilghman, George Plater, Charles Carroll, Barrister, Charles Carroll of Carrollton, Robert Goldsborough, and later Thomas Johnson.[17] See

---

17. This impressive list includes three of Maryland's four signers of the Declaration of Independence (Charles Carroll of Carrollton, Chase, and Paca), three future Maryland governors (Johnson, Paca, and Plater), three future judges of one of Maryland's post-revolutionary courts, the General Court (Chase, Johnson, and Paca), and two future associate justices of the United States Supreme Court (Chase and Johnson). Goldsborough had served as Maryland Attorney General from 1766–68. Tilghman had served as a delegate to the Continental Congress before being replaced by Charles Carroll of Carrollton. Paca also later served

R. Walsh and W.L. Fox, *Maryland, A History,* 1632–1974, at 96–97 (1974). Much more likely is that the words "capital or" were deleted from the 1776 MDR as surplusage because "criminal prosecutions" covered the subject.

Completely consistent with the recognition in the first draft of 1776 MDR Article 19 that capital prosecutions would survive the 1776 MDR is Article 24 of that document, the original language of which appeared in the MDR from 1776 to 1851. It read:

> "That there ought to be no forfeiture of any part of the estate of any person for any crime, except murder, or treason against the state, and then only on conviction and attainder."

F. Green, *A Declaration of Rights, and the Constitution and Form of Government, Agreed to by the Delegates of Maryland, in Free and Full Convention Assembled,* at 10 (1776) (available at MSA SC M 3145, at 221, *et seq.,* http://aomol.net/megafile/msa/speccol/sc4800/sc4872/003145/html/m3145-0221.html). *And see* Friedman–Temple at 661.[18]

IV Blackstone at 380–81 describes attainder.

> "When sentence of death, the most terrible and highest judgment in the laws of England, is pronounced, the immediate inseparable consequence by the common law is *attainder.* For when it is now clear beyond all dispute, that the criminal is no longer fit to live upon the earth, but is to be exterminated as a monster and a bane to human society, the law sets a note of infamy upon him, puts him out of its protection, and takes no further care of him than barely to

---

as a federal judge in Maryland. Of the eight men, at least five were lawyers (Charles Carroll, Barrister, Chase, Goldsborough, Johnson, and Paca). *See generally* E. Papenfuse, *A Biographical Dictionary of the Maryland Legislature, 1635–1789* (1985); *The Biographical Cyclopedia of Representative Men of Maryland and District of Columbia* (1879). Charles Carroll of Carrollton also studied law in France and at the Middle Temple in London but was prohibited from practicing law because he was a Roman Catholic. *See* R. Hoffman, *Princes of Ireland, Planters of Maryland: A Carroll Saga, 1500–1782,* at 163–64 (2007).

**18.** Former Article 24 is now Article 27.

see him executed. He is then called attaint, *attinctus,* stained, or blackened.... [F]or, by an anticipation of his punishment, he is already dead in law. This is after *judgment:* for there is great difference between a man *convicted* and *attainted;* though they are frequently through inaccuracy confounded together. After conviction only, a man is liable to none of these disabilities; for there is still in contemplation of law a possibility of his innocence.... But when judgment is once pronounced, both law and fact conspire to prove him completely guilty; and there is not the remotest possibility left of anything to be said in his favour. Upon judgment therefore of death, and not before, the attainder of a criminal commences: or upon such circumstances as are equivalent to judgment of death; as judgment of outlawry on a capital crime, pronounced for absconding or fleeing from justice, which tacitly confesses the guilt. And therefore either upon judgment of outlawry, or of death, for treason or felony, a man shall be said to be attainted."

A related provision is § 58 of the 1776 Maryland Constitution, directing that "all penalties and forfeitures, heretofore going to the king or proprietary, shall go to the state, save only such as the general assembly may abolish or otherwise provide for."

Attainder was abolished by Chapter 138 of the Acts of 1809 in § 10.[19]

### Contemporaneous Practical Construction of 1776 MDR Article 14

1776 MDR Article 14 was renumbered to Article 16 in the Constitutions and Declarations of Rights of 1864 and 1867. Friedman–Temple at 656. In 1883, this Court decided the appeal of a wife beater who had been sentenced to sixty days confinement and to be whipped seven lashes. *Foote v. State,*

---

**19.** Attainder was reintroduced in the 1864 MDR before being permanently abolished by 1867 MDR Article 27. *See* Friedman–Temple at 661.

59 Md. 264, 1883 WL 4110 (1883). He argued that flogging violated the second clause of Article 16. Our predecessors' response to this argument is equally responsive to Miles's "discovery" of the meaning of "sanguinary Laws."

"The terms 'cruel and unusual pains and penalties,' and 'cruel or unusual punishment,' have been incorporated in each successive Constitution in this State from 1776 to the present time. That the punishment of whipping was not considered a 'cruel or unusual punishment,' and, therefore, coming within the prohibition of the Constitution, is most conclusively shown by the fact that the punishment by whipping was recognized by the statute law of the State under all these Constitutions, certainly down to the Constitution of 1864, and then only obliterated from the statute book, not by direct repeal, but by force of the constitutional amendment abolishing slavery.

"It is true, that under some of the later Constitutions the punishment by the laws was confined to negroes and slaves, but the words 'cruel or unusual' covered all cases of punishment, and were as applicable to negroes and slaves as to whites. At the time of the adoption of the Bill of Rights in 1776, and for a long time before, and for a long time thereafter, the punishment of whipping for certain offences was imposed upon whites and blacks alike. We are not dealing with the expediency, justice, or efficacy of this punishment, but only with the true interpretation of the terms of the Constitution under which we live. When, therefore, we find that the people who made this Constitution, and who must be presumed to understand the meaning of the terms they use, have, from the time these words were first incorporated, in 1776 down to 1882, a period of more than a hundred years, through the several successive Legislatures, uniformly held that the punishment of whipping was not included in that class which the Constitution forbids, we should violate the plainest principles of the construction of statutes now to decide otherwise. We have not only the contemporaneous, but the continued, exposition of the meaning of the words in this long course of legislative

construction, upheld and continually enforced by the courts, in the imposition of the punishment."

*Id.* at 266–68.

In the two and one-half decades immediately following the adoption of 1776 MDR Article 14, the General Assembly enacted laws requiring or permitting the death penalty. See the chart below. (We have omitted enactments punishing treason with death which may implicate the exception for state safety.)

### Laws of Maryland (1776–1799)

| Year | Chapter | Section | Description | Penalty |
|------|---------|---------|-------------|---------|
| 1778 | XVII | N/A | Prohibits forging or altering certificate for payment of journal of accounts, or knowingly passing the same in payment. | Death without benefit of clergy. |
| 1790 | V | I–XIII | Establishes bank in Baltimore-town. | |
| | | XIV | Prohibits forging or passing counterfeit checks or notes of the bank. | Adjudged felon; punishable in discretion of court, "so as the same do not extend to death" or more than seven years. |
| 1793 | LVII | II | Authorizes Governor to appoint justices of oyer and terminer and gaol delivery in Baltimore County to try felonies and other crimes. | |
| | | XII | Maiming punishable as felony. | Death without benefit of clergy or imprisonment at labor. |
| | | XXVIII | General Court and the other county courts given same jurisdiction. | As above. |
| 1799 | LXI | I | Horse stealing. | Death without benefit of clergy. |
| | | II | Arson of ship. | Death without benefit of clergy. |
| 1799 | LXXXII | II | Causing immediate loss of vessel. | Death without benefit of clergy. |
| 1809 | CXXXVIII | III & IV(1) | Murder in first degree. | Death by hanging. |
| | | IV(6)(7) | Rape. Carnal knowledge. | Death by hanging or prison. |
| | | V(1) | Arson. | Death by hanging or prison. |

| (2) | Storehouse burning. | Death by hanging or prison. |
|---|---|---|

### Kilty's Code [20]

Pursuant to a resolution of the General Assembly adopted at the November 1798 session, William Kilty was engaged to compile, in chronological order, those enactments or session laws passed by the provincial and state assemblies from the year 1692 "to the end of the present session," noting those that were in force and those that had been repealed or had expired, "or have ceased to have any operation." I *Kilty's Laws of Maryland,* at 2 (1799). Obviously, if the sanguinary laws clause of 1776 MDR Article 14 had abolished capital punishment (but for state safety), then Kilty should not have included in this report a Maryland-originating statute providing for the death penalty. Nevertheless, we find included in Kilty's Code, as a statute in force, the following:

> Laws 1720, c. 25, § 2, making willfully burning any courthouse where records are actually or usually kept punishable by death without benefit of clergy, "in the same manner as if such offender had been convict[ed] of maliciously and wilfully burning a mansion-house."

> Laws 1737, c. 2, § 4, making theft of a ship or slave punishable by death as a felon without benefit of clergy. The legislation carried a three year sunset provision. It was renewed by Laws 1740 c. 6 and made permanent by Laws 1798 c. 71.

> Laws 1744, c. 5, § 2, making arson of tobacco punishable by death without benefit of clergy. The legislation carried a three year sunset provision. It was renewed by Laws 1747 c. 11 and made "perpetual" by Laws 1751 c. 7.

---

**20.** William Kilty, born in 1757, was a Revolutionary War veteran who practiced law in Annapolis and in Washington, D.C. In 1801, he was appointed chief judge for the Circuit Court for the District of Columbia. Returning to Maryland in 1806, he was appointed Chancellor and served to his death in 1821. *See* W.L. Marbury, "The High Court of Chancery and the Chancellors of Maryland," *Report of the Tenth Annual Meeting of the Maryland State Bar Association,* at 137–55 (1905).

Laws 1785, c. 87, § 8, providing that "every person charged, apprehended or indicted, for any capital crime" shall have the right of habeas corpus.

Laws 1799, c. 61, § 1, making horse stealing punishable by death without benefit of clergy.

Laws 1799, c. 61, § 2, making arson of a ship punishable by death without benefit of clergy.

### Kilty's British Statutes

By a resolution of the General Assembly at the November 1809 session, the Chancellor (Kilty) and the judges of the Court of Appeals were "directed to report all such parts of the English Statutes as were proper to be introduced and incorporated into the body of the Statute law of the State." J. Alexander, *A Collection of British Statutes In Force in Maryland,* Preface at vii (1870). Kilty undertook the work. His 1811 report (Report) is entitled

"A **REPORT** OF ALL SUCH *ENGLISH STATUTES* AS EXISTED AT THE TIME OF THE FIRST EMIGRATION OF THE PEOPLE OF MARYLAND, AND WHICH BY EXPERIENCE HAVE BEEN FOUND APPLICABLE TO THEIR **LOCAL AND OTHER CIRCUMSTANCES**; AND OF SUCH OTHERS AS HAVE SINCE BEEN MADE IN *ENGLAND OR GREAT–BRITAIN,* AND HAVE BEEN INTRODUCED, USED AND PRACTISED, BY THE *COURTS OF LAW OR EQUITY;* AND ALSO SUCH PARTS OF THE SAME AS MAY BE PROPER TO BE INTRODUCED AND INCORPORATED INTO THE BODY OF THE STATUTE LAW OF THE STATE. MADE ACCORDING TO THE DIRECTIONS OF THE LEGISLATURE, *BY WILLIAM KILTY, CHANCELLOR OF MARYLAND. TO WHICH ARE PREFIXED,* AN INTRODUCTION AND LISTS OF THE STATUTES WHICH HAD NOT BEEN FOUND APPLICABLE TO THE CIRCUMSTANCES OF THE PEOPLE: WITH FULL AND COMPLETE INDEXES. PUBLISHED UNDER THE DIRECTIONS OF THE GOVERNOR

AND COUNCIL, PURSUANT TO A RESOLUTION OF THE GENERAL ASSEMBLY."

In *Dashiell v. Attorney General,* 5 H. & J. 392, 403, 1822 WL 445 (Md.1822), the Court of Appeals said that Kilty's Report "was compiled, printed, and distributed, under the sanction of the State, for the use of its officers, and is a safe guide in exploring an otherwise very dubious path."

Kilty divided the British Statutes into three classes: (1) statutes that did not extend to Maryland; (2) statutes that, although applicable, should not be incorporated *into* Maryland law; and (3) those that were applicable to Maryland and proper to be incorporated.

Kilty lists as a statute proper to be incorporated, the Statute of Westminster 2, 13 Edw. I, Stat. 1, c. 34 (1285). It provided, in the first branch thereof, "That if a Man from henceforth do ravish a Woman married, Maid, or other, where she did not consent, neither before nor after, he shall have Judgement of Life and of Member." Report at 213. Kilty referred to cases in the province where offenders were "capitally convicted" for this offense. *Id.* He included that "[t]his statute was therefore in force in the province and in the state, and remains so as to such offences committed before the passing of the Act of 1809, concerning crimes and punishments, (Ch. 138,).... By the 4th section of the said [1809] act, the punishment for this offence (and of the accessory before) is death by hanging, or confinement in the penitentiary[.]" *Id.*

Applicable, but not proper to be incorporated, was 1 Edward VI, c.12 (1547). Section 10 of that statute took away benefit of clergy from several offenses, including murder. Kilty concluded that it should not be incorporated because the punishment for the offense, hanging, was already recognized by the 1809 statute. Report at 164–65. Section 13 of the 1547 British statute declared wilful killing by poisoning to be murder. Kilty points out that the purpose of Section 13 was only to repeal an earlier British statute which had made murder by poisoning treason, punishable by boiling to death. Section 13 of the 1547 act was not necessary or proper to be

incorporated because of the 1809 Maryland legislation. Report at 165.

The statute of 21 James I, c. 27 (1623) was entitled, *"An Act to Prevent the Destroying and Murthering of Bastard Children."* Citing IV Blackstone at 198, Kilty states "that it has been usual in England, upon trials for this offence, to require some sort of presumptive evidence, that the child was born alive, before the other constrained presumption (that the child whose death is concealed, was therefore killed by its parent) is admitted to convict the prisoner." Report at 172. Kilty found that, commencing with the year 1665, there had been upwards of thirty prosecutions in Maryland under this statute, "in many of which the offenders were sentenced to death[.]" *Id.* On account of "the injustice and inhumanity of enforcing [the 1623 statute], and the change made in the law respecting murder, by the act of 1809, Ch. 138, it may confidently be said, that this statute is not proper to be incorporated with our laws." *Id.* at 173.

If Miles is correct, then Kilty was oblivious to the invalidity of capital punishment under the 1809 legislation under 1776 MDR Article 14.

### Death Warrants

Attached to this opinion, as Appendix A, is an excerpt from the State's brief referencing the numerous death warrants signed by Maryland governors between 1782 and 1792, both inclusive.

### *The Constitutional Convention Commission*

Fast forwarding two centuries, we find that the sanguinary Laws clause was addressed in the Report of the Maryland Constitutional Convention Commission (1967). That Commission proposed eliminating the clause. In the Comment to the Commission's draft MDR § 1.11, "Unusual Punishment," the Commission said in relevant part:

"This draft section omits the admonition in Article 16 of the present Declaration that 'sanguinary Laws ought to be avoided as far as it is consistent with the safety of the

State.' In modern usage a 'sanguinary law' is one providing for capital punishment. The Commission suggests that a law prescribing capital punishment for *other than a most serious crime* would be considered 'cruel and unusual' by present day standards, and so would be prohibited by this draft section."

*Id.* at 111 (emphasis added). The new constitution proposed by the 1967–1968 Constitutional Convention similarly would have omitted the sanguinary Laws clause from present MDR Article 16.[21] There is no indication that the Commission or the Convention thought that the sanguinary laws clause abolished the death penalty in 1776 and that, by eliminating that clause in the proposed, but never ratified, constitution, they were opening the door for the General Assembly to reinstitute the death penalty for most serious crimes.

## CONCLUSION

Death was the common law penalty for murder. The sanguinary laws clause applied to legislative action and has never been triggered by any Maryland statutory modifications of the common law relating to the types of murders to which the death penalty may apply or by the statutes modifying the method of executing the death penalty. Alternatively, if the sanguinary Laws clause of current MDR Article 16, as originally adopted, was retroactive and self-executing, as to existing common law, the clause was not intended to exclude death, *per se,* as a possible penalty for murder. Consequently, we do not reach Miles's supplementally briefed argument that the legislative repeal of the death penalty demonstrates that the death penalty is not necessary for the safety of the State.

---

21. The proposed constitution would have provided:
   "**Section 1.11. Unusual Punishments.**
   "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted. Conviction of crime shall not work corruption of blood or forfeiture of estate."
   Constitutional Convention of Maryland, *Comparison of Present and Proposed Constitutions,* at 123 (1968).

DENIAL BY THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY OF MOTION TO CORRECT ILLEGAL SENTENCE AFFIRMED.

APPELLANT TO PAY THE COSTS.

McDONALD, J., dissents.

Appendix A

### Death Warrants

"[D]uring his tenure, Governor Paca approved the death penalty for six criminal defendants. Specifically, Governor Paca authorized a warrant of execution on December 10, 1782, for James, slave of James Perdue of Worcester County, said execution by hanging to take place on December 27, 1782, for the crimes of housebreaking and stealing the contents therein. GOVERNOR AND COUNCIL (PARDON PAPERS), 1782–1784, Maryland State Archive citation no. S1061-2, Location 02/46/01/002, Box 2, Folder 22.

"Governor Paca also approved death warrants on October 25, 1783, for the execution by hanging of John Lee and Robert Connaway, said executions to take place on November 5, 1783, for the crimes of breaking into the storehouse of one John McLuse and carrying away certain goods. GOVERNOR AND COUNCIL (PARDON PAPERS), 1782–1784, Maryland State Archive citation no. S1061-2, Location 02/46/01/002, Box 2, Folder 55.

"On December 31, 1783, Governor Paca authorized a warrant of execution to be carried out on January 9, 1784, against George Riggs of Worcester County for housebreaking and robbery of the house of William Ironshire on or about March 10, 1783. GOVERNOR AND COUNCIL (PARDON PAPERS), 1782–1784, Maryland State Archive citation no. S1061-2, Location 02/46/01/002, Box 2, Folder 60.

"Governor Paca approved a warrant of execution on October 8, 1784, for William Merchmant of Talbot County, for breaking into the house of one Henry Hooper, said execution by hanging to take place on October 15, 1784. GOVERNOR AND COUNCIL (PARDON PAPERS), 1782–1784, Maryland

State Archive citation no. S1061–2, Location 02/46/01/002, Box 2, Folder 112.

"Bridget Martin of Baltimore County was also the subject of a warrant of execution approved by Governor Paca on July 23, 1784, for the murder by poison of one Elizabeth Brown on or about December 10, 1783. GOVERNOR AND COUNCIL (PARDON PAPERS), 1782–1784, Maryland State Archive citation no. S1061–2, Location 02/46/01/002, Box 2, Folder 113.

. . . .

". . . Governor William Smallwood (who served from November 26, 1785, to November 24, 1788), and Governor John Eager Howard (who served from November 24, 1788, to November 14, 1791) issued numerous warrants of execution.

"Governor Smallwood, for example, signed death warrants on April 25, 1786, December 1, 1786, May 8, 1787, October 4, 1787, December 13, 1787, March 6, 1788, July 28, 1788, and September 13, 1788, for criminal defendants who committed various crimes, including murder, housebreaking, highway robbery, and returning after banishment. GOVERNOR AND COUNCIL (PARDON RECORD), *Record of Pardons, Noli Prosequies and Death Warrants and Proclamations commencing December 1785 ending November 1790*, 1785–1790, Maryland State Archive citation no. S1107–1, Location 02/26/05/026, pages 4, 31, 45, 58, 64, 86, 95 and 99.

"For his own part, Governor John Eager Howard personally signed death warrants on January 31, 1789, March 19, 1789, April 10, 1789, April 28, 1789, June 9, 1789, August 13, 1789, August 28, 1789, February 17, 1790, and September 24, 1790. *Id.* at pages 108, 116, 117, 121, 128, 130, 138, and 155. Governor Howard additionally signed death warrants on January 25, 1791, September 23, 1791, October 12, 1791, and November 7, 1791. GOVERNOR AND COUNCIL (PARDON RECORD), *Record of Pardons, Noli Prosequies, Death Warrants, Proclamations commencing January 1791 and ending February '97*, 1791–1806, Maryland State Archive cita-

tion no. S1107–2, Location 02/26/05/026, pages 3, 4, 21, and 22."

(Footnote omitted).

McDONALD, J., dissenting.

I would dismiss the appeal as moot under Maryland Rule 8–602(a)(10) in light of the enactment of Chapter 156, § 1, Laws of Maryland 2013. That law repealed the statutory provisions for carrying out a death penalty, formerly found in Maryland Code, Correctional Services Article, § 3–901 *et seq.*

To the extent that the Court feels compelled to address the State constitutional question raised by Appellant, more analysis would be necessary before I would agree that the Sanguinary Laws Clause could not limit application of the death penalty.[1] As the Circuit Court recognized, the federal Constitution has no analog to the Sanguinary Laws Clause in the Maryland Declaration of Rights. And, as the Majority opinion acknowledges, one state with a similar constitutional provision abolished capital punishment apparently on the basis of that provision. Majority op. at 550–52, 80 A.3d at 248–49.

It appears from historical sources that the phrase "sanguinary laws" refers to punishments such as the death penalty. This peculiar phrase is found in an 18th century commentary on an essay of a contemporary legal philosopher who advised against the use of capital punishment—works that were familiar to lawmakers when the first State Constitution was drafted and that were found in the library of one of the primary drafters of the Maryland Declaration of Rights. Article 16 of the Maryland Declaration of Rights states that such a punishment is to be "avoided" unless necessary for the "safety of the State." The Majority opinion reasons that the Sanguinary

---

1. At one point, the Majority opinion states that Petitioner argues that the constitutional language "abrogated capital punishment" in 1776. Majority op. at 548, 80 A.3d at 247. This appears to be an overstatement; the Appellant recognizes the qualifying language that permits capital punishment when necessary for the "safety of the State" and argues that the Sanguinary Laws Clause "limits"—not abolishes—the death penalty. Appellant's Brief at 3.

Laws Clause addresses only legislative action taken after adoption of the 1776 constitution. Like the Circuit Court, I would think that this limitation, even if directed in the first instance to legislative action, would likewise apply to the courts.[2] While it may be true that the Legislature enacted laws including capital punishment following the adoption of the 1776 constitution, Majority op. at 573–76, 80 A.3d at 262–63, a constitutional principle is not necessarily limited by a subsequent legislative enactment.[3] Finally, the Majority opinion does not specifically analyze the qualifying phrase that limits such punishments to matters implicating the "safety of the State." But, given the recent elimination of the death penalty in this State, resolution of these issues seems an unnecessary exercise.

---

2. The First Amendment to the federal Constitution states that "Congress shall make no law ...." respecting certain important freedoms, but it seems doubtful one could argue that these limitations do not apply to the courts.

3. It is also sometimes the case that principles stated in foundational documents are not immediately put into practice (e.g., "... all men are created equal ...").